WALSH v. CITY OF RIVER ROUGE

OPINION OF THE COURT

1. CONSTITUTIONAL LAW—CURFEW—RIGHT TO ASSEMBLE—LICENSED BUSINESSES.

The invocation of a curfew or restriction on the right to assemble or prohibiting the right to carry on business licensed by the State of Michigan involves the suspension of constitutional liberties of the people and it, in effect, suspends normal civil government.

2. MUNICIPAL CORPORATIONS—ORDINANCES—STATUTES—LEGISLATIVE INTENT—STATE PRE-EMPTION—GOVERNOR—MAYORS.

Statute delineating lines of authority, placing in the hands of the Governor extraordinary power which he might deem it necessary to invoke, to deal with "great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger thereof, when public safety is imperiled" and with a specific provision that mayors may apply to him for his exercise of such powers, embodies a legislative intent to lodge exclusive powers in the Governor and, in the event the Governor exercises any of the powers granted to him by the statute, local government has no power to act and, if the Governor does not elect to exercise any of the powers granted to him, local government is without power to act since the field of permitted action has been entirely pre-empted by state law (MCLA §§ 10.31–10.33).

3. STATUTES — GOVERNOR — STATE OF EMERGENCY — MUNICIPAL CORPORATIONS — ORDINANCES.

Emergency powers granted to the Governor by the statute authorizing him to proclaim a state of emergency are exclusive but the authority of local government to protect life and property through such instrumentalities as police and

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law §§ 353–355.
[2–5] 37 Am Jur, Municipal Corporations §§ 152, 153, 451.

fire departments, and to enforce the laws of this state and authorized local regulations and ordinances, remains in full force and effect (MCLA §§ 10.31–10.33).

4. Municipal Corporations — Ordinances — Curfew — Statutes — State Pre-emption — Governor — Mayors.
   Emergency curfew ordinance granting powers to a mayor which powers were also granted to the Governor by statute, the proclamation of the mayor issued prior to the passing of the ordinance and the mayor's proclamation subsequently issued pursuant to the ordinance were invalid as the powers granted to the Governor by the statute were exclusive (MCLA §§ 10.31–10.33; River Rouge Ordinance # 228).

Dissenting Opinion
T. E. Brennan, J.

5. Municipal Corporations—Statutes—Ordinances—Riots.
   *Cities have the power, expressly granted by the legislature to pass ordinances for the purpose of preventing and quelling riots and the state has not repealed that legislative declaration by indirection or preemption (MCLA § 91.1).*

Appeal from Wayne, Nathan J. Kaufman, J., and from Court of Appeals prior to decision. Submitted June 23, 1971. (No. 21 June Term 1971, Docket No. 52,907.) Decided August 27, 1971.

Complaint by David N. Walsh and William Robinson against the City of River Rouge and John F. McEwan, Mayor, for mandamus and a declaratory judgment that an ordinance and two proclamations of the Mayor of the City of River Rouge are null and void. First proclamation held invalid, the ordinance and second proclamation held valid. Plaintiffs appealed to the Court of Appeals and applied to the Supreme Court for leave to appeal prior to decision by the Court of Appeals. Leave granted. Affirmed as to first proclamation, reversed as to ordinance and second proclamation.

David N. Walsh, *in propria persona,* and *Craig P. Colby,* for plaintiffs.

*Logan & Huchla,* for defendants.

*Amici Curiae:*

American Civil Liberties Union of Michigan (by *Erwin Ellmann,* Chairman, *Joel M. Shere, Sheldon M. Meizlish,* and *Sheridan V. Holzman,* Co-Chairmen, Legal Committee).

City of Ypsilanti (by *Bronson & Egnor*).

ADAMS, J.   The City of River Rouge has a geographical area of approximately one square mile. It is one of 18 so-called "downriver" communities south of Detroit within the County of Wayne. On Monday, April 27, 1970, fighting between black and white students at River Rouge High School spread into the streets of that city. Following an afternoon during which police reinforcements were called in and looting and vandalism occurred, the Mayor of River Rouge issued a proclamation effective at 4 p.m., April 27.[1]

The proclamation prohibited possession of firearms, ammunition, explosives, inflammable materials or liquids, or other dangerous weapons, within the city by any citizen except law officers; prohibited "unlawful traffic" within the city; created a 6 p.m. to 5 a.m. curfew when no person could be on the city streets except those proceeding to and from work or answering emergency calls or who had special permission; closed all liquor stores and prohibited the sale of alcoholic beverages; prohibited all assemblies of more than five persons "unless per-

---

[1] See Appendix # 1—Proclamation of April 27, 1970.

mission has been granted"; closed gas stations in the city except between the hours of 12 noon and 5 p.m.; and prohibited the sale of more than five gallons of gas to individuals with private automobiles. Violation of any provision in the proclamation was made a misdemeanor.

The next day the City Council met in regular session at 8 p.m. and passed an emergency curfew ordinance[2] which purported to give to the Mayor the power to "proclaim a state of emergency, in the City of River Rouge whenever he is advised by the Chief of Police that a civil disturbance, riot or civil commotion is in progress  *  *  *  ." The Mayor reissued his proclamation,[3] effective at 8 p.m., April 28, the same time the ordinance was passed.

On April 29, 1970, plaintiff David Walsh, an attorney, filed this action. Plaintiff sought mandamus and a declaratory judgment annulling River Rouge's emergency Curfew Ordinance and the two proclamations by the Mayor. The next day William Robinson was added as a party plaintiff. He had been arrested at 7:45 p.m. on April 28 for violation of the curfew provision of the Mayor's April 27 proclamation. Robinson plead guilty and was sentenced to 30 days in jail or a fine of $100. After the circuit court decision in this case, he petitioned the municipal court for a rehearing, which was granted. It resulted in dismissal of all charges.

On May 4, 1970, Circuit Judge Nathan Kaufman issued an opinion in which he held that the first proclamation was void because it was without any statutory or charter basis; upheld the power of the city to pass Ordinance # 228; and upheld the valid-

[2] See Appendix # 2.—Emergency Curfew Ordinance # 228, April 28, 1970.

[3] The proclamation issued on April 28, 1970, is identical with that of April 27, 1970.

ity of the Mayor's proclamation issued pursuant to the ordinance.

Plaintiffs appealed to the Court of Appeals and also applied for leave to appeal to this Court. Because defendant city argued that dismissal of the charges against Robinson and termination of the emergency proclamation on May 1, 1970 mooted the case, plaintiffs moved to add four intervenor plaintiffs who had been convicted of violating the River Rouge curfew after the passage of the emergency Curfew Ordinance and the concurrent mayoral proclamation. We granted the application for leave to appeal directly to this Court and the motion to intervene and add parties plaintiffs. (384 Mich 757.)

Plaintiffs contend that PA 1945, No 302 (MCLA §§ 10.31–10.33; Stat Ann 1969 Rev §§ 3.4[1]–3.4[3]), gives exclusive power to the Governor to declare a state of emergency; that home rule cities have neither express nor implied power under the Michigan Constitution or the home rule act to give their mayors the power to declare a state of emergency or to assume powers comparable to the powers delegated to the Governor; that River Rouge Ordinance # 228 and the proclamations by the Mayor are invalid because contrary to Michigan and United States constitutional provisions, contrary to the general laws of the state and contrary to the city's own mandatory provisions on publication of ordinances. The City of River Rouge and Mayor McEwan maintain a contrary position on all issues. The American Civil Liberties Union of Michigan, by brief *amicus curiae,* supports the position of plaintiffs. The City of Ypsilanti, also by brief *amicus curiae,* maintains that the inherent police powers of a city permit the enactment of a curfew ordinance which may be invoked upon a showing of

an existing imminent threat to the community's public welfare and safety.

We consider only the question of pre-emption of the field by the statute giving to the Governor exclusive power since our determination of that issue is dispositive of this case. PA 1945, No 302, is reproduced in its entirety in Appendix # 3. A point-by-point comparison of the powers therein granted to the Governor, with the powers granted to the Mayor of River Rouge by Ordinance # 228, will reveal that every power granted to the Mayor by the ordinance is also granted to the Governor by Act 302. It should be further noted that Act 302 provides: " * * * when public safety is imperiled, either upon application of the mayor of a city, sheriff of a county, the commissioner of the Michigan state police, or upon his own volition, the governor may proclaim a state of emergency and designate the area involved."

In pleading the necessity for the municipal powers granted by Ordinance # 228, the brief for the City of River Rouge states:

"If a city is to survive, in an uncertain age, its power of immediate response to emergency, catastrophe or to major disorder must be equal to that task. Cities and municipalities traditionally have been expected to maintain law and order within their corporate limits and have always been recognized as having police powers sufficient to maintain that fundamental basic condition.

\* \* \*

" * * * The response of the Down River communities, 18 in number, with all the additional police manpower, and fire fighting capabilities which they immediately contributed and all under the direction of the Wayne County Sheriff, might have been ineffectual and unavailing without the imposition of

emergency curfew regulations to clear the streets and keep the streets clear of the disorderly."

The City of Ypsilanti in its brief *amicus* states:

"Municipal curfew ordinances have been, and continue to be, invaluable enforcement tools for the 'core city' community, with its problems of high crime, volatile demographic composition, and grossly inadequate economic and human resources to cope with the phenomenon of escalating crime and confrontation of the 1960's and 70's. In short, the 'Ypsilantis' of today face a large battery of social ills taxing their law enforcement facilities to the limit; emergency night-time curfews have served as a complement to protection of that City's life and property. Curfews have been an indispensable prophylactic measure in stemming the conflagration and in halting the wrongdoing before it becomes irreparable or totally destructive of institutions and people.

\* \* \*

"For the overtaxed law enforcement officials, confronted with imminent or full-blown threats to public welfare and safety, the curfew is an indispensable tool. It nullifies, or at least mitigates the potentialities of the mob psychology, especially in the context of added anonymity at night. By clearing the streets in preventive fashion the enormous costs generated from the proliferation of riotous activity and destruction are kept down. The curious are forced to stay out of the way of enforcement efforts and concurrently, for their own benefits, to escape being caught up in the enforcement nets put out by officials in times of crisis.

"And as stated above, the emergency curfew alleviates much of the intricate mechanics of detection and detention which are almost impossible at night in the face of flaming buildings and the flying glass shrapnel of broken windows. Experience shows that absent overwhelming numerical strength, only with

'exceptional' talent can police identify the criminal act of each member of a mob, and tie that into a foolproof identification of individuals involved, particularly at night. Some other tools besides this hit-and-miss approach are imperative. Most importantly, the emergency curfew is that reasonable and necessary prophylactic to quell the threat and destruction in its infancy, in furtherance of that greater common concern for public order and safety."

In 1968, the Michigan legislature passed House Bill No. 3302 "to authorize counties, cities, townships and charter townships to declare a state of emergency in cases of civil disorder; to provide for the issuance of executive orders imposing curfews and the prohibiting of the sale of alcoholic liquors, firearms and ammunition; and providing for penalties."

On July 1, 1968, Governor George Romney returned Enrolled House Bill No. 3302 without his approval, stating in his message:

"No one realizes more than I that local law enforcement is the first line of defense in the battle against crime and violence. Over the years I have consistently proposed and supported measures designed to give more strength and more training to local law enforcement officials.

"However, civil disorders, riots or other similar public disorders and emergencies pose special law enforcement problems. Experience has shown that normally, at the first sign of any civil disorder which might get beyond the control of local officials, contact has been made with state officials for assistance. State Police have assisted local units when needed. When any disorder has exceeded the control of the local police and State Police, National Guard have been committed if deemed necessary in the combined judgment of local officials, the State Police and myself.

"At all times, the rights of the citizens of any particular community are to be safeguarded. Usually, however, when a major civil disturbance is threatened or takes place, the problem exceeds the confines of any one locality.

"Cities do not exist in isolated areas. The tri-county metropolitan area in southeast Michigan, for example, is a checkerboard of local units of government.

"This results in my major concern about the wisdom of this bill.

"The authority given to the local officials by this bill contains within it the ability to declare a state of public emergency 'in the event of a threat of civil disorder.' No criteria or standards are set forth upon which the local official must base his decision, and consequently, it is left solely to his judgment. Unfortunately, past experience has shown that frequently officials within the immediate area of any disturbance have not been able to obtain such information as will give them an accurate overall picture of the problem. There have been numerous instances when urgent demands for National Guard have been made by local officials, and yet when the situation has been objectively surveyed by those trained for such emergencies, such requests have proven to be unfounded. In no instance has there been a delay or failure on the part of the Governor to declare a state of emergency if the facts warranted such action.

"In addition, I fear that this type of legislation would allow certain municipalities to declare states of emergency, impose curfews, and to utilize the other powers granted without communicating these decisions to the persons in areas immediately adjacent to the affected city. Innocent people traveling through such a community could be unaware that local officials had proclaimed any state of emergency.

"It is essential in times of public crisis and civil disorders that a uniform plan of action be estab-

lished, not just within a particular city, or township, but throughout the entire area. To do less would be ineffective, even dangerous.

"Thus, because when such disorders occur they involve the assistance of state personnel and because broad uniform action is needed, it is my opinion that the authority which this type of legislation attempts to invest in local officials is unsound and should be retained by state officials.

"I realize the importance which has been attached to this particular piece of legislation, and I know further that local officials have been desirous of this type of authority. But in considering the overall good of the people of this state and the need for maintaining the highest degree of law enforcement possible in emergency situations, I cannot approve this legislation.

"For these reasons, I hereby veto Enrolled House Bill 3302."

In 1970, the legislature passed Enrolled Senate Bill No. 9, "An Act to authorize political subdivisions to enact a prescribed uniform ordinance authorizing their chief executive officers or designees to proclaim a state of civil emergency in cases of civil disorder and providing for orders imposing curfews and restricting certain activities; and to provide for penalties."

On July 31, 1970, Governor William G. Milliken returned Enrolled Senate Bill No. 9 without his approval and in his executive message stated:

"This measure would arm the chief executive officers of all cities, villages, townships and charter townships with the authority of proclaiming, by executive order, a state of 'civil emergency' within the confines of their respective political units and to issue pursuant thereto orders restricting and regulating public activity.

"Various forms of this bill have been introduced in the Legislature in recent years. In 1968, a similar

measure was presented to former Governor Romney for his signature; but was vetoed by him, his rationale being set forth in his letter of July 1, 1968, returning to the House of Representatives Enrolled House Bill 3302. His rationale was sound, and, although the measure before me is technically substantially improved, the basic policy question of affording this kind of authority to local units of government still remains at the heart of the matter.

"I am cognizant of the fact that Attorney General Kelley, in a letter opinion of August 15, 1968, to Representative Arthur J. Law, indicated that in some instances some local units of government may be able to avail themselves of this authority.

"But it should be noted that in Mr. Kelley's letter opinion on page 9 he appended to his legal conclusion the following:

" 'I firmly believe that under almost all circumstances it would be much wiser to rely upon a full scale response, coordinated by the state, than to permit piecemeal measures by individual communities. Scores of separate units of government exist in many metropolitan areas. Their reactions to emergencies could result in a crazy-quilt response which could provide loopholes which could prove disastrous.'

"More recently, in Mr. Kelley's letter to me dated July 29, 1970, he reiterated that position verbatim. I totally concur.

"Moreover, the Department of State Police, our first line of defense in the handling of all civil disturbances, has consistently urged me to veto this and similar measures.

"In addition to the overriding policy consideration prompting my veto of this measure, I find several technical deficiencies in the bill.

"In particular, many of the definitions and terms used may be less than legally specific and sufficient. This is of particular concern in a criminal statute,

which by nature requires the utmost care and precision in drafting in order to support prosecution.

"I also find Section 4 troublesome. In distinguishing between residents and nonresidents by virtually affording immunity from arrest and prosecution to the latter group, this section seems to invite disturbing outside influences during a time of public crisis or emergency. Moreover, because of this provision, enforcement of and subsequent prosecution under a local emergency proclamation would in many cases be difficult, if not impossible. In addition, it is unrealistic to require that, in moving from one political unit to another during a time of emergency, citizens be aware of: (1) the existence of different proclamations and orders as between different political units; (2) the content thereof as between such units; and (3) the jurisdictional lines of such units. Yet without such knowledge, citizens may be unjustly prosecuted and convicted for violation of such proclamations and orders.

"Again, however, the major consideration prompting this action is that I think, it bad public policy to afford numerous political units throughout the state this authority which could result in a totally chaotic situation in the event of a civil emergency affecting one or more of them.

"At no time in the past has there been a lack of response or support at the state level in the handling of civil disturbances. Where local units apprise state authorities at the earliest suspicion of civil disorder, adequate and effective response has been available and will continue to be provided.

"For the foregoing reasons, I hereby veto Enrolled Senate Bill 9."

Neither House Bill No. 3302 (1968) nor Senate Bill No. 9 (1970) was passed over the Governors' vetoes.

It is against this background of competing policy considerations that we must resolve the legal ques-

tion as to whether PA 1945, No 302, embodies a legislative intent to lodge exclusive powers in the Governor, thereby pre-empting the field from local governments. The act specifically declares in § 2, "the legislative intent [is] to invest the governor with sufficiently broad power of action in the exercise of the police power of the state to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster. The provisions of this act shall be broadly construed to effectuate this purpose."

In the case of *National Amusement Co.* v. *Johnson* (1935), 270 Mich 613, a City of Grand Rapids ordinance banned contests to test the endurance of the participants. A State law regulated such contests. Justice FEAD, writing for the entire Court, stated (pp 616, 617):

"It is the rule that, in the absence of specific statutory or charter power in the municipality, the provisions of an ordinance which contravene a State law are void. *People* v. *McGraw* [1915], 184 Mich. 233; 43 C.J. p. 215. What the legislature permits, the city cannot suppress, without express authority therefor. *State* v. *Brittain* [1883], 89 N.C. 574. The rule as to conflict is thus fairly stated:

" 'The question as to whether or not a municipal ordinance or regulation is in conflict with the general law is sometimes difficult of solution, and cannot be determined by any fixed rule. Each particular case must be determined as it arises. Broadly speaking, the question whether a conflict exists depends upon whether the State has occupied the whole field of prohibitory legislation with respect to the subject. If such is the case, it is held that a conflict exists. In order that there be a conflict between a State enactment and a municipal regulation both must contain either express or implied conditions which are inconsistent and irreconcilable with each

other. Mere differences in detail do not render them conflicting. If either is silent where the other speaks, there can be no conflict between them. Where no conflict exists, both laws stand.   *   *   *   As a general rule, additional regulation to that of a State law does not constitute a conflict therewith.' 43 C.J. p. 218.

"Where an amusement, which has been lawful and unregulated, is not evil *per se* but may be conducted in a good or bad manner, is the subject of legislation, regulatory, not prohibitory, it would seem clear that the legislature intended to permit continuance of the amusement, subject to statutory conditions. The statute makes it unlawful to conduct a walkathon only in violation of certain conditions. This is merely a common legislative manner of saying that it is lawful to conduct it if the regulations are observed. *Schneiderman* v. *Sesanstein* [1929], 121 Ohio St. 80 (167 N.E. 158, 64 A.L.R. 981). Assuming the city may add to the conditions, nevertheless the ordinance attempts to prohibit what the statute permits. Both statute and ordinance cannot stand. Therefore, the ordinance is void.

"This in no way interferes with the exercise of the proper charter powers of the city to remedy untoward conditions which may attend such contests. Whether, under other circumstances or powers, such remedy may be by way of regulation or prohibition is not before us."

In *Noey* v. *Saginaw* (1935), 271 Mich 595, a case involving an attempt by the City of Saginaw to fix closing hours for liquor establishments more restrictive than those provided in the regulations of the Liquor Control Commission, the Court reiterated the rule stated in *National Amusement Co., supra,* saying (p 598):

"The power conferred upon the city under the constitutional provision is 'subject to the Constitution and general laws of this State.' The constitu-

tional amendment, providing for a liquor control commission, vested in it when established by act of the legislature *'complete control of the alcoholic beverage traffic within this State, including the retail sales thereof.'* The legislature, after providing for its creation, conferred  upon it, subject to certain exceptions, *'the sole right, power and duty to control the alcoholic beverage traffic  *  *  *  within the State,'* and to *'adopt rules and regulations governing the carrying out of this act and supplemental thereto.'*

"The word 'control,' as used in the Constitution, means to regulate and govern." (Emphasis by Court.)

In the case of *Builders Association* v. *Detroit* (1940), 295 Mich 272, involving a municipal ordinance more restrictive than the state law with regard to the transaction of business on Sunday, the Court said (p 277):

"The foregoing authorities clearly indicate to us that if a city ordinance prohibits something which a State statute permits, or vice versa, there is a conflict and the State law must prevail. Here the ordinance prohibits what the law permits and, therefore, is in conflict with it."

In the case of *Richards* v. *Pontiac* (1943), 305 Mich 666, a state act permitted trailer coaches to remain in a given location for an indefinite length of time. A city ordinance limited the use of a trailer park by an occupied trailer for a period not to exceed three months in any year and required a local license fee in addition to the license fee established by state law. This Court concluded that the intent and purpose of the state act was to take over the entire field of regulation and supervision of trailer

parks in the state and consequently the city ordinance was not allowed to stand.[4]

In *Grand Haven* v. *Grocer's Cooperative Dairy Company* (1951), 330 Mich 694, the City of Grand Haven attempted by ordinance to require that milk delivered within its limits be pasteurized in approved milk plants within five miles of the city. It was held that the legislature, by passage of a state law, intended to and did take over plenary control of pasteurization of dairy products. This Court said (p 702):

"The constitutional limitation on the power of cities to pass laws and ordinances relating to its municipal concerns is that such power is subject to the Constitution and general laws of the State. Const 1908, art 8, §§ 20, 21. The State has enacted a comprehensive law wherein plenary regulations pertaining to the processing (including pasteurization) and marketing of dairy products are set forth. There is no provision in the State law granting to cities the power to impose additional restrictions or requirements."

In *Miller* v. *Fabius Township Board* (1962), 366 Mich 250, a majority of this Court concluded that the state statute regulating speed and use of watercraft upon inland lakes and prohibiting water skiing during the period one hour after sunset to one hour prior to sunrise had not pre-empted the field and that, consequently, a township ordinance restricting power boat racing and water skiing on Pleasant Lake each day after the hour of 4 p.m. until the following day at 10 a.m. was a valid exercise of local governmental power. After quoting extensively

---

[4] In *Bane* v. *Pontiac Twp.* (1955), 343 Mich 481, this Court concluded after an examination of later cases that the state had not attempted to take over the entire field of regulation and supervision of trailer parks.

from 37 Am Jur, Municipal Corporations, § 165, p 790, the majority opinion states (p 257):

"The question we have to determine, then, is whether the State has so preempted the field that it would be unconstitutional for the township to attempt to regulate water skiing by ordinance."

Michael H. Feiler, in an article entitled, *Conflict Between State and Local Enactments—The Doctrine of Implied Preemption,* appearing in 2 Urban Lawyer 398 (1970), makes this observation (pp 404, 405):

"Preemption occurs where there is a conflict between the legislative intent to regulate an area and the very act of local legislation in conflict with this legislative intent.

\*　\*　\*

"The question is properly whether the scheme can work effectively in the face of local intervention.[5]

In examining the problem in this case, it must be borne in mind that we are dealing with the exercise of powers granted to deal with impending or actual public crisis or disaster. The invocation of a curfew or restriction on the right to assemble or prohibiting the right to carry on businesses licensed by the State of Michigan involves the suspension of constitutional liberties of the people. It, in effect, suspends normal civil government. The war powers of the Federal government envisage the use of such measures under the military in times of martial law.[6]

---

[5] See also: Note, *Conflicts Between State Statutes and Municipal Ordinances,* 72 Harv L Rev 737, 744–747 (1959).

[6] See 56 Am Jur, *War,* § 29, pp 154, 155. See also, Comment, *Constitutional and Statutory Bases of Governors' Emergency Powers,* 64 Mich L Rev 290 (1965), which focuses "upon the extreme breadth of executive emergency authority and, in particular, upon the power to use military force during times of public emergency."

It is conceded in the present case that, in the event the Governor exercises any of the powers granted to him by PA 1945, No 302, local government has no power to act. Conversely, it must be concluded, if the Governor does not elect to exercise any of the powers granted to him, local government is without power to act since the field of permitted action has been entirely pre-empted by the state law. Act 302 is a broad grant of extraordinary powers with a specific provision that mayors may apply to the Governor for the exercise by him of such powers and a declaration by the legislature that the provisions of the act are to be broadly construed to effect its purpose. It was passed by the legislature to delineate lines of authority and to place in the hands of the Governor extraordinary powers which he might deem it necessary to invoke to deal with "great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger thereof, when public safety is imperiled."

While the emergency powers granted to the Governor by PA 1945, No 302 are exclusive, the authority of local government to protect life and property through such instrumentalities as police and fire departments, and to enforce the laws of this state and authorized local regulations and ordinances, remains in full force and effect.

The decision of the trial court as to the proclamation of April 27, 1970, is affirmed, and as to Ordinance # 228 and the proclamation of April 28, 1970, it is reversed. No costs, a public question being involved.

T. M. KAVANAGH, C. J., and BLACK, T. G. KAVANAGH, SWAINSON, and WILLIAMS, JJ., concurred with ADAMS, J.

## *APPENDIX # 1*

Whereas a state of emergency has been proclaimed in the City of River Rouge, and

Whereas, it is necessary in order to protect life and property within the City of River Rouge,

Therefore, I, John F. McEwan, Mayor of the City of River Rouge, in furtherance of the Proclamation of said state of emergency, do hereby issue the following orders and rules and regulations:

1. No persons except duly authorized law enforcement officers shall possess or carry any firearms, ammunition, explosives, inflammable materials or liquids, or other dangerous weapons within the boundaries of the City of River Rouge.

2. Such force and control as may be necessary to prohibit unlawful traffic within the City of River Rouge is hereby granted to the authorities named herein.

3. No persons, shall be allowed on the public streets or thoroughfares in the City of River Rouge between the hours of 6 p.m., and 5 a.m., provided however, that this regulation shall not apply to persons going to and from their normal occupations, persons answering emergency calls, and to those whom permission has been specifically granted.

4. All places of amusement and all places dispensing or selling alcoholic beverages within the City of River Rouge are hereby ordered closed until further notice; however, this does not preclude drug stores, super markets, or hotel dining rooms from operating as drug stores, super markets, or hotel dining rooms, however, they may not dispense or sell alcoholic beverages or liquor.

5. All meetings or assemblies of more than five persons is [*sic*] prohibited unless permission has been granted.

6. All gasoline stations within the City of River Rouge, Michigan may open daily between the

hours of 12:00 noon and 5:00 p.m. Said stations may sell up to five gallons to individuals with private automobiles. However, this gasoline must be placed in the tank of the automobile. Said gasoline stations may sell an unlimited amount of gasoline to drivers of commercial vehicles; said gasoline must be placed in the tank of the commercial vehicle.

I do hereby direct and designate the Chief of Police of the City of River Rouge and any such persons as may be authorized by him to carry out the foregoing orders, rules and regulations. Such orders, rules and regulations shall be effective at 4 p.m., Monday, April 27, 1970, and shall continue in force and effect until amended, modified, or rescinded, or until said such state of emergency shall cease to exist.

Violation of any of the foregoing rules and regulations shall be a misdemeanor as provided by law.

Copies of this Order and Proclamation shall be posted in ten or more public areas in the City of River Rouge.

Given under my hand and Seal of the City of River Rouge, Michigan this twenty-seventh day of April in the year of our Lord One Thousand Seven Hundred. [*Sic.*]

/s/ John F. McEwan
Mayor, City of River Rouge.

## *APPENDIX # 2*

An Ordinance Enacting New Sections 7, 8, 9 and 10 to Ordinance Number 176 being "The Curfew Ordinance" granting additional emergency powers to the Mayor under certain stated conditions, requiring adults as well as minors to observe the conditions of curfew, including the banning of the sale of all inflammable liquors [*sic*] or gasoline or intoxicating liquors within the City during the continuance of any emergency.

.

Be it Ordained by the Council of the City of River Rouge:

Whereas, the peace and safety of the inhabitants of the City of River Rouge is or may be threatened by civil disturbances, looting, rioting and civil disorders, and physical violence which can best be controlled and subdued only by limiting the movement and actions of all of its citizens for the common good, and

Whereas, the occurrences of such disturbance, violence and civil commotion, when and so often as they may occur, require the immediate determination of the existence of such emergency,

Now Therefore, in order to protect life and property in the City of River Rouge from marauding vandals, rioters, or persons acting in defiance of the law, and from physical violence, threatened or imminent, due to the presence of large groups of persons acting in defiance of the Charter or Ordinances of the City or Statutes of the State of Michigan.

New sections 7–10 are hereby enacted in form as follows:

Section 7. That the Mayor or in his absence, the Mayor pro-tempore, is hereby authorized to proclaim a state of emergency, in the City of River Rouge whenever he is advised by the Chief of Police that a civil disturbance, riot or civil commotion is in progress, and that there is present within the city limits or on the border thereof, large groups of persons engaged in rioting, looting and in the destruction of property, or threatening physical violence in defiance of the ordinance, charter of the City or Statutes of the State of Michigan, and that the presence of such large groups of persons is likely to require extraordinary measures to quell, subdue or control, including an appeal to civil authority of the surrounding communities for additional police personnel to meet such conditions, and having received such report from the Chief of Police, the

Mayor, or in his absence, the Mayor pro-tem, is hereby empowered to proclaim the existence of an emergency.

That upon the proclamation of the existence of such emergency, the Mayor is hereby granted emergency powers to declare, issue and decree and may also issue orders incidental to the said emergency, placing into effect any of the following restrictions, prohibitions and affirmative commands as conservator of the peace of the City of River Rouge, and such restrictions shall thereafter be in full force and effect for the duration of the emergency so determined and proclaimed.

7(a) He may order that no persons except duly authorized law enforcement officers shall possess or have on their persons or carry any firearms, ammunition, explosives, inflammable materials or liquids, or other dangerous weapons, including but not by way of limitation, chains, clubs or missiles, within the boundaries of the City of River Rouge.

7(b) He may order that such force and control as may be necessary to prohibit unlawful vehicular traffic within the City of River Rouge may be then and there granted to the authorities named herein.

7(c) He may order that no persons, shall be allowed on the public streets or thoroughfares in the City of River Rouge between the hours of 6 p.m., and 5 a.m., provided, however, that this regulation shall not apply to persons going to and from their normal occupations, persons answering emergency calls, and to those whom permission has been specifically granted, by County authorities, or public utilities repair. He may also fix a different period of curfew hours.

7(d) He may order that all places of amusement and all places dispensing or selling alcoholic beverages within the City of River Rouge be closed until further notice; however, this does not

preclude drug stores, super markets, or hotel dining rooms from operating as drug stores, super markets, or hotel dining rooms; they may not, however, dispense or sell alcoholic beverages or liquor.

7(e) He may order that all meetings or assemblies of more than five persons be prohibited unless permission has first been granted, exclusive of meetings of governmental or legislative bodies.

7(f) He may order that no ammunition, flammable fuel or gasoline be sold in the City or he may in his discretion, and if conditions warrant, relax such restriction to permit gasoline service stations within the City to open daily between the hours of 12:00 noon and 5:00 p.m., or any other period of time to be specified in his order, and he may order that such gasoline stations may sell up to five (5) gallons of gasoline to individuals with private automobiles delivered into the tanks of said automobile.

Section 8. At all times when the special orders, restrictions or prohibitions have been placed in effect after proclamation of the existence of a state of emergency within the City of River Rouge it shall be unlawful for any person, adult or minor, to violate the provisions of said proclamation and the violation of such emergency rules and regulations so proclaimed, during the effective period of said proclamation shall be a misdemeanor and be punishable by imprisonment not to exceed 90 days or by a fine of not to exceed Five Hundred ($500.00) Dollars or both fine and imprisonment in the discretion of the Municipal Judge.

Section 9. An emergency once declared by the Mayor, in his absence by the Mayor pro-tem, shall be deemed in full force and effect until cancelled by direct proclamation of the Mayor, or by specific resolution of the City Council terminating such emergency.

Section 10. This Ordinance is passed as an emergency measure and the Council does by the vote by which this Ordinance is passed, hereby declare that a municipal emergency exists, which makes it imperative that this Ordinance shall become effective forthwith, the nature of said emergency being that looting and pillaging has occurred within the City limits and the presence of persons threatening mob action in defiance of law and order are known to the police authorities, and it is necessary for the protection of life and property, and to preserve the public health, safety, and welfare of the residents of this City that this Ordinance be effective immediately.

## *APPENDIX # 3*

### (PA 1945, No 302 [MCLA §§ 10.31–10.33; Stat Ann 1969 Rev §§ 3.4(1)–3.4(3)])

AN ACT authorizing the governor to proclaim a state of emergency, and to prescribe the powers and duties of the governor with respect thereto; and to prescribe penalties.

Section 1. During times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger thereof, when public safety is imperiled, either upon application of the mayor of a city, sheriff of a county, the commissioner of the Michigan state police, or upon his own volition, the governor may proclaim a state of emergency and designate the area involved. Following such proclamation or declaration, the governor may promulgate such reasonable orders, rules and regulations as he deems necessary to protect life and property, or to bring the emergency situation within the affected area under control. Without limiting the scope of the same, said orders, rules and regulations may provide for the control of traffic, including public and private transportation, within

the area or any section thereof; designation of specific zones within the area in which occupancy and use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated; control of places of amusement and assembly, and of persons on public streets and thoroughfares; establishment of a curfew; control of the sale, transportation and use of alcoholic beverages and liquors; control of the possession, sale, carrying and use of firearms, other dangerous weapons, and ammunition; and control of the storage, use, and transportation of explosives or inflammable materials or liquids deemed to be dangerous to public safety. Such orders, rules and regulations shall be effective from the date and in the manner prescribed in such orders, rules and regulations and shall be made public as provided therein. Such orders, rules and regulations may be amended, modified, or rescinded, in like manner, from time to time by the governor during the pendency of the emergency, but shall cease to be in effect upon declaration by the governor that the emergency no longer exists.

Sec. 2. It is hereby declared to be the legislative intent to invest the governor with sufficiently broad power of action in the exercise of the police power of the state to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster. The provisions of this act shall be broadly construed to effectuate this purpose.

Sec. 3. The violation of any such orders, rules and regulations made in conformity with this act shall be punishable as a misdemeanor, where such order, rule or regulation states that the violation thereof shall constitute a misdemeanor.

T. E. BRENNAN, J. (*dissenting*). Cities have the power, expressly granted by the legislature to pass

ordinances for the purpose of preventing and quelling riots. (MCLA § 91.1; Stat Ann 1949 Rev § 5.1740.)

I do not agree that the State has by indirection or preemption repealed that legislative declaration.