# Order

Michigan Supreme Court
Lansing, Michigan

June 4, 2020

161377 & (7)(13)(14)(15)(18)

HOUSE OF REPRESENTATIVES and
SENATE,
          Plaintiffs-Appellants/
          Cross-Appellees,
and

JOHN F. BRENNAN, MARK BUCCHI,
SAMUEL H. GUN, MARTIN LEAF, and
ERIC ROSENBERG,
          Intervenors-Appellants,

v

GOVERNOR,
          Defendant-Appellee/
          Cross-Appellant.
_____/

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

SC: 161377
COA: 353655
Court of Claims: 20-000079-MZ

On order of the Court, the motions for immediate consideration and the motion to file brief amicus curiae are GRANTED. The application for leave to appeal prior to decision by the Court of Appeals and the application for leave to appeal as cross-appellant are considered, and they are DENIED, because we are not persuaded that the questions presented should be reviewed by this Court before consideration by the Court of Appeals. The prospective intervenors' motion to docket is DENIED.

BERNSTEIN, J. (*concurring*).

I agree with my fellow Justices that this case presents extremely significant legal issues that affect the lives of everyone living in Michigan today. And that is exactly why I join the majority of this Court in denying the parties' bypass applications—*because* I believe that a case this important deserves full and thorough appellate consideration.

Additionally, with the issuance of Executive Order No. 2020-110, "shelter in place" is no longer mandated in the state of Michigan. While recognizing that not all restrictions have been lessened (and acknowledging the possibility of future restrictions being reimplemented), I believe the parties and this Court would benefit most from having the vital constitutional issues of this case fully argued in the Court of Appeals before receiving a final determination from our Court. See *League of Women Voters v Secretary of State*, 505 Mich 931 (2019) (denying the plaintiffs' bypass application). Cases of the ultimate magnitude, such as this one, necessitate the complete and comprehensive consideration that our judicial process avails.

The significance of this case is undeniable. And with many of the restrictions on

daily life having now been lifted, our eventual consideration of these issues must receive full appellate consideration before our Court can most effectively render a decision on the merits of this case.

CLEMENT, J. (*concurring*).

In this case, the Legislature advances several arguments asking us to hold that a law it enacted 75 years ago, 1945 PA 302, codified at MCL 10.31 *et seq.*, is unconstitutional or the Governor's actions are beyond the statutory authority contained in that statute, and that the Governor's executive orders issued under that statute in response to the COVID-19 pandemic are consequently invalid. Contrary to what is suggested by the dissents from the Court's order today, the Legislature is not litigating the civil liberties of all Michiganders. Moreover, to read the dissents, one might be left with the impression that this Court has declined altogether to decide this case. It has not—it has only declined to decide the case before the Court of Appeals does. I believe this is both compelled by our court rules and advisable as a matter of prudence. Because I believe the Court neither can nor should review this case before the Court of Appeals does, I concur with the Court's order denying these bypass applications.

I believe, first, that the rules governing bypass applications are not satisfied here. Given that "the supreme court shall have . . . appellate jurisdiction as provided by rules of the supreme court," Const 1963, art 6, § 4, whether the rules have been satisfied is seemingly of its own jurisdictional and constitutional significance. Our rules provide that, to grant a bypass application, "[t]he application must show" either that "delay in final adjudication is likely to cause substantial harm" or that "the appeal is from a ruling that . . . any . . . action of the . . . executive branch[] of state government is invalid[.]" MCR 7.305(B)(4)(a) and (b). I do not believe the Legislature satisfies either requirement. In its bypass application, the Legislature argues that the "substantial harm" prong is satisfied because "Michiganders . . . are living under a cloud of ambiguity" given the debate over whether the Governor's executive orders responding to the COVID-19 pandemic are actually legal. But this case is not a class action filed on behalf of all Michiganders to litigate their civil liberties—it is a suit filed by the Legislature asserting that certain of its institutional prerogatives have been infringed by the Governor's actions. The Legislature shows no substantial harm *to the Legislature* caused by going through the ordinary appellate process. As an institution, it is exactly as free to enact legislation—whether responsive to this pandemic or otherwise—as it was before any of the Governor's executive orders were entered.[1] As to the "invalidity of executive action"

---

[1] Justice VIVIANO argues that the Legislature's separation-of-powers argument, if vindicated, would be a "substantial harm," and that "[a]t the bypass stage, we need not decide the merits of the Legislature's separation-of-powers argument." I agree that we need not decide those merits, and we are not by denying this bypass application. Given the novelty of the Legislature's standing argument, however, I do not believe it can show

prong, the Legislature argues that "this appeal involves a ruling that has already declared" Executive Order No. 2020-68 invalid. However, the Legislature does not appeal *that* ruling—rather, it appeals the ruling that Executive Order No. 2020-67 and its successors *are* valid. In my view, the Legislature's inability to satisfy MCR 7.305(B)(4) is fatal to its bypass application.[2] Since the Michigan Constitution commits to us the ability to prescribe our own appellate jurisdiction, we are obliged to scrupulously adhere to the restrictions we have imposed on ourselves if we are to sit in judgment of the constitutionality of 1945 PA 302 and the Governor's actions under it.[3]

---

that it has suffered a substantial harm at this point with the certainty required to justify the extraordinary act of granting a bypass appeal. After Court of Appeals review, the Legislature would need to show only that either "the issue involves a substantial question about the validity of a legislative act," "the issue has significant public interest and the case is one . . . against . . . an officer of the state . . . in the officer's official capacity," or that "the issue involves a legal principle of major significance to the state's jurisprudence." MCR 7.305(B)(1) through (3). I predict these showings will be much easier to make.

[2] Justice ZAHRA argues that "even assuming there is a shortcoming in the Legislature's application, that defect is cured by the Governor's" bypass cross-appeal, but I disagree. The court rules list what an application for leave to appeal "must show," MCR 7.305(B), and the Legislature's application does not make the required showing. There is no indication under the rule that a party who fails to make a required showing can have its application rehabilitated by the other side. I am also unpersuaded by Justice VIVIANO's citation of the rules of the Supreme Court of the United States. Justice VIVIANO does not deny that the language used there is different from our rules and requires a showing only "that the case is of such imperative public importance as to justify deviation from normal appellate practice . . . ." Sup Ct Rule 11. Our general rules governing leave to appeal require a similar showing, see MCR 7.305(B)(1) through (3), but for a bypass application our rules require the *additional* showing, beyond the importance of the issues, of either substantial harm or that the case is an appeal from a ruling that certain legislative or executive actions are invalid, MCR 7.305(B)(4). I do not believe such a showing is made here. Nor do I believe that the decisions of other state supreme courts, with different court rules, should control our application of our court rules.

[3] Justice VIVIANO asserts that "[i]t is indisputable that our Court has jurisdiction over this case," but with a plurality of this Court concluding otherwise, it is plainly disputable. An application "must show" the items included in the list. MCR 7.305(B). Echoing that language, commentary on our rules also characterizes it as mandatory. See Gerville-Réache, *Expediting Review*, § 7.23, p 199 in Michigan Appellate Handbook (Shannon & Gerville-Réache eds, 3d ed, January 2018 update) (remarking that a bypass application "must show" the grounds listed in MCR 7.305(B)(4)). Moreover, the original form of the rule provided only that bypass applications show that "delay in final adjudication is likely to result in substantial harm"; the additional option in MCR 7.305(B)(4)(b) that a bypass

I also concur with denying the Governor's bypass cross-appeal. "It is a general rule in this state . . . that only a party aggrieved by a decision has a right to appeal from that decision," meaning that " '[a] party who could not benefit from a change in the judgment has no appealable interest.' " *Ford Motor Co v Jackson (On Rehearing)*, 399 Mich 213, 225-226 (1976) (citation omitted). It is, at minimum, uncertain to me whether the Governor is aggrieved by the decision of the Court of Claims such that she would have appellate standing at this juncture. On the one hand, the Court of Claims ruled that EO 2020-68 was an invalid evasion of the requirement under MCL 30.403(3) and (4) of the Emergency Management Act (EMA), MCL 30.401 *et seq*., that the Legislature approve disaster and emergency declarations after 28 days; invalidating EO 2020-68 falls within the terms of MCR 7.305(B)(4)(b) and is arguably the sort of appealable interest an appealing party must possess. However, the Court of Claims also ruled that MCL 10.31(1) was an adequate basis for all of the Governor's substantive orders that have purported to regulate much of life in Michigan after April 30, 2020.[4] Because no substantive regulation issued by the Governor has been held invalid, I question whether the Court of Claims' ruling that EO 2020-68 invalidly evaded the EMA is anything more than an advisory opinion.[5] And, because "it is only opinions issued by the Supreme

---

application can also show that it is an appeal from a ruling that various forms of law or government action are invalid was added in 2002. See 466 Mich lxxxvi, lxxxix (2002). Since such a judicial declaration would already have fallen within the grounds listed in MCR 7.305(B)(1) through (3), the fact that MCR 7.305(B)(4)(b) was added to MCR 7.305(B)(4) indicates that we understood it to be mandatory for bypass applications; otherwise, it would be redundant of what is already stated in MCR 7.305(B)(1) through (3). Our past practice also indicates it is mandatory, as we have denied bypass applications on the basis that the grounds in the rule were not satisfied. See *White v Detroit Election Comm*, 495 Mich 884 (2013); *Barrow v Detroit Election Comm*, 495 Mich 884 (2013). (Note that at the time *White* and *Barrow* were decided, this requirement was found at MCR 7.302(B)(4). It was moved to MCR 7.305(B)(4) as part of a general rewrite of the rules governing practice in this Court. See 497 Mich xcxi, cxcv (2015).)

[4] The Legislature approved an extension of the Governor's initial emergency declaration under the EMA until April 30, see 2020 SCR 24, but did not adopt further extensions.

[5] On the other hand, the Governor may have a viable *contingent* cross-appeal, in which she challenges the decision of the Court of Claims to the extent that the appellate courts reverse the Court of Claims' decision upholding her executive orders under MCL 10.31(1). If "the cross-appellant, like any appellant, must be an aggrieved party in some respect, meaning it must be able to identify a concrete and particularized injury that can be redressed in the context of the cross-appeal," Rose, *Appeals of Right in the Court of Appeals*, § 4.46, p 100, in Michigan Appellate Handbook (Shannon & Gerville-Réache eds, 3d ed, January 2018 update), it may be that the Governor's interest in maintaining any cross-appeal would be contingent on the outcome of the Legislature's appeal. Given

Court and published opinions of the Court of Appeals that have precedential effect under the rule of stare decisis," *Detroit v Qualls*, 434 Mich 340, 360 n 35 (1990), the Court of Claims' remarks about EO 2020-68 will not control future litigation over the propriety of the Governor's actions under the EMA—even future COVID-19 litigation.[6] The Governor appears aware of this reality, because when she announced a subsequent extension of the COVID-19 state of emergency in Executive Order No. 2020-99, she continued to declare emergencies under both MCL 10.31(1) and—"[s]ubject to the ongoing litigation"—the EMA. Given my qualms, I am not convinced that Justice ZAHRA is correct to allege that the Governor's bypass cross-appeal "cure[s]" any defects in the Legislature's application. I am also unmoved by the fact that both parties ask us to grant these bypass applications. This Court writes the court rules; I do not believe the parties can rewrite the rules for us by their mutual agreement so as to bootstrap their way to jurisdiction.

I also do not believe it would be prudent to hear this case at this juncture. The statutes at issue have seen very little litigation arise under them, meaning there is little on-point authority. Moreover, the theory by which the Legislature asserts standing to bring this suit in the first place is entirely novel in Michigan. Further appellate review and development of the arguments will only assist this Court in reaching the best possible answers.[7] Until a vaccine for COVID-19 is invented, our society will be living with the

---

these uncertainties, however, at minimum I do not believe it would be wise to exercise any discretion we may have to hear this case without allowing it full appellate review. For all these reasons, I do not think the Governor's bypass cross-appeal rehabilitates the Legislature's defective initial bypass application.

[6] Justice VIVIANO questions whether my reasoning renders the bypass appeal provision nugatory given that, in bypassing the Court of Appeals, a party will necessarily "be appealing a nonbinding decision." But this is clearly incorrect. Had the Governor been told that her substantive executive orders were invalid, she would have been ordered by a court to stop doing something she was doing, and exposed to contempt sanctions if she did not, without regard to whether the reasoning was binding on future disputes. I question whether the Court of Claims' ruling here aggrieved the Governor because it essentially answered the hypothetical question of whether her executive orders *would* be valid *if* MCL 10.31(1) were not an adequate basis for them. Such a ruling does not appear to control her current orders, nor is its reasoning binding on future disputes. It is, at minimum, a sufficiently uncertain question that I do not believe this Court can properly predicate its review of this case on this foundation.

[7] As Justice VIVIANO points out in his dissent, there are numerous cases relating to COVID-19 making their way through our state and federal courts. While many of these cases raise issues distinct from those raised by the Legislature in this case, in at least one, the Court of Appeals has granted leave to appeal on a very similar issue—"whether the trial court abused its discretion in ruling that plaintiff's claim regarding the

risk of the spread of this disease and the argued necessity of emergency measures to mitigate that spread. There is little prospect of these disputes being rendered moot, and I have little doubt that the Court will take them up in the future.

I also disagree that this Court should heavy-handedly direct the Court of Appeals in its management of this litigation. First of all, if there is a need for expedited consideration, the parties are free to request it from the Court of Appeals, which is better positioned to know how best to balance the need for expeditious review with the resources it has available to scrutinize the arguments being made. I disagree with Justice VIVIANO that the Court of Appeals will simply put this case on any "conveyor belt," and I believe they will recognize "this is no ordinary case." Second, the cases in which we most often direct expedited review are election cases in which the parties have externally imposed deadlines they must satisfy to submit paperwork or print ballots. See, e.g., *League of Women Voters v Secretary of State*, 505 Mich 931 (2019). Third, I believe many of the observations that justify denying this bypass application also justify declining to order an extraordinary schedule in the Court of Appeals. Justice ZAHRA argues that "the people of this state have a great interest in the final disposition of these issues," but the people of this state are not a party to the case—the Legislature is, suing in its institutional capacity and arguing that its prerogatives are being violated. Until a final judicial resolution of these issues is reached, the Legislature is free in the interim to avail itself of the ordinary legislative process under the Constitution. That this Court has resolved this bypass application in less than two weeks is, I believe, evidence enough that we are treating these issues with appropriate urgency.

As noted, the issue before us is not whether we will *ever* decide these issues, but rather whether we will decide them before the Court of Appeals has considered them. Because I conclude that we neither can nor should grant these bypass applications, I concur with our order denying them.

MCCORMACK, C.J., and CAVANAGH, J., join the statement of CLEMENT, J.

MARKMAN, J. (*dissenting*).

I dissent from the majority's decision to deny the parties' applications to bypass the Court of Appeals in order to expedite the final resolution of the present dispute. Indeed, in all likelihood, the consequence of our decision today will be to ensure that this Court never issues a meaningful decision concerning the nature and required procedures of the emergency authority of this state. For the following reasons, I would grant these

unconstitutionality of the [emergency powers of the governor act], MCL 10.31 *et seq.*, was unlikely to succeed." *Mich United for Liberty v Governor*, order of the Court of Appeals, entered May 29, 2020 (Docket No. 353643).

applications.

First, I would grant the applications because they pertain to an issue of the greatest practical importance to the more than 10 million people of this state: the validity of executive orders declaring a state of emergency and thereby enabling a single public official to restrict and regulate travel, assembly, business operations, educational opportunities, freedoms and civil liberties, and other ordinary aspects of the daily lives of these people, including matters of crime and punishment and public safety. To put it even more specifically, the present applications place into question the entirety of the processes and procedures by which the executive orders that have defined nearly every minute, and nearly every aspect, of the lives of "we the people" of Michigan for more than the past two months were fashioned into law.

Second, I would grant the applications because, notwithstanding their vast differences in apprehending the legal and constitutional preconditions required of an emergency order, the parties *commonly* argue that this Court should grant their bypass applications in light of the profound significance and practical impact of the present emergency orders.

Third, I would grant the applications because they implicate a "case or controversy" of the greatest historical consequence between the two representative and accountable branches of our state government: each in concurrence seeking the counsel of the third branch as to what is demanded by the constitutional charter that has guided the people's government for the past 185 years. The Governor contends that her office possesses the authority to issue the executive orders in response to the present emergency, while the Legislature in response contends that her office lacks such authority absent its own participation. Put simply, what is at issue is how the extraordinary emergency powers of government are to be invoked and how the decision-makers of our two most fundamental constitutional institutions are respectively to be engaged.

Fourth, I would grant the applications because time is an altogether relevant consideration to what is required of this judiciary. Our state continues in the midst of an emergency in which both the lives and the liberties of its people are being lost each day. By today's action, it is unlikely that this Court will ever decisively resolve the present dispute and thus that whatever errors or excesses may have been made in the course of the present emergency will never be pronounced or remedied but left only to be repeated on the occasion of what inevitably will arise some day as our next emergency.

Fifth, I would grant the applications because this case cries out for the most expedited and final review of the highest court of this state. If there is a matter, if there is an obligation, that compels the most urgent action of this Court, it is the present matter, our present obligation. This case defines the very purpose and the fundamental

responsibility of a supreme court of this union of states. By our decision to deny the applications for bypass, we bypass an exercise of authority to decide what is perhaps the most substantial dispute ever presented to this Court, not only diminishing our standing among the judicial institutions of our federal system but diminishing our relevance within the judicial institutions of this state itself.

ZAHRA, J., joins the statement of MARKMAN, J.

ZAHRA, J. (*dissenting*).

I dissent from this Court's order denying both litigants' applications for leave to appeal from the Court of Claims, thereby leaving intact without immediate review the Governor's various emergency orders issued in response to the COVID-19 pandemic and the Court of Claims order ruling in part that the Governor acted erroneously under MCL 30.401 *et seq*. I would grant the applications and decide the matters forthwith. I also dissent from this Court's inexplicable failure to direct the Court of Appeals to hear this case on an expedited basis. This case presents palpable constitutional questions that are of compelling interest to every resident, business, and employer in Michigan. The instant matter is arguably the most significant constitutional question presented to this Court in the last 50 years. By granting both applications, this Court could put to rest with finality whether and to what extent the legislation on which the Governor relied to issue the serial emergency COVID-19 orders remains a valid source of legal authority for those orders. Admittedly, deciding these difficult questions is no easy task. But the people of this state rightly demand that this Court resolve such difficult questions. Because each resident's personal liberty is at stake, it is emphatically our duty to decide this case. I dissent from the Court's failure to immediately undertake this duty.

Life for people throughout Michigan was turned on its head when on March 10, 2020, in response to the COVID-19 pandemic that threatened widespread contagion, serious and sometimes fatal illness, and a critical overload to our health system, the Governor issued Executive Order No. 2020-4, declaring a state of emergency under the authority of two separate statutory delegations of emergency authority: 1945 PA 302, known as the "emergency powers of the governor act" (EPGA), MCL 10.31 *et seq*.; and the Emergency Management Act (EMA), MCL 30.401 *et seq*. The EMA carries a 28-day limit on the amount of time in which the Governor can issue orders under a state of emergency before the act requires the Governor to declare an end to the emergency, unless both houses of the Legislature extend the period through a resolution.[8]

---

[8] MCL 30.403(3). The Governor, however, argues that the Court of Claims erred by concluding that she cannot issue new orders reinstituting the effect of her prior orders at the end of each order issued under the EMA.

Over the next several weeks, the Governor issued numerous additional statewide orders generally requiring people to stay at home unless their departure from home was essential, closing all nonessential[9] businesses, closing all schools before the end of the school year, and seriously restricting travel, assembly, and other aspects of daily life. Law and nonemergency medical offices throughout Michigan were closed indefinitely. Both houses of the Michigan Legislature granted the Governor an extension of authority to April 30, 2020, but neither the House of Representatives nor the Senate passed a resolution to grant any further extension. On the day the EMA expressly required the declaration of emergency to be rescinded, the Governor rescinded the declaration and, within minutes, declared another statewide emergency on the basis of COVID-19, ordering that all the previous orders should now be considered effective under the new order. The Governor separately declared a state of emergency under the EPGA and ordered that all previous orders should be considered effective under that declaration as well.

People throughout Michigan were understandably frustrated over their inability to leave home to, among other things, work, engage in commerce, obtain preventative health care, visit friends and family, and maintain their personal appearance with salon and grooming services. Sporadic peaceful protests broke out throughout the state in which some residents practiced civil disobedience. The political branches of government divided over the issue. The Legislature believed it should be permitted a seat at the table in crafting emergency orders, and the Governor proclaimed unilateral authority to act.

The Michigan House of Representatives and the Michigan Senate sued the Governor in the Court of Claims, seeking a declaratory ruling that the Governor's authority under the EMA had expired and that the EPGA pertained only to local matters and did not authorize a statewide declaration of emergency. The Governor responded that each source of statutory authority continued to provide her with the power to issue orders for the protection of the public health. The Court of Claims agreed with the Legislature that the Governor's authority under the EMA had expired, but held that the EPGA granted the Governor independent authority to issue orders that would protect lives and control the emergency situation created by COVID-19. That same day, the Legislature filed an application for leave to appeal in the Court of Appeals and filed in this Court an application for leave to appeal under MCR 7.305(B)(4), which permits "an appeal before a decision of the Court of Appeals."

The Governor filed a brief in response to the Legislature's application in this Court as well as an application for leave to appeal challenging two holdings of the Court

---

[9] Many of the Governor's orders distinguished essential from nonessential activity. Still, in other areas, the people were left to wonder whether certain activities in which they wished to engage were permitted under the various orders. See note 3 of this statement.

of Claims: (1) the conclusion that the Legislature has standing to bring a declaratory action, and (2) the holding that Executive Order No. 2020-68 was invalid because the Governor's authority to act under the EMA had expired.

Significantly, both of our coequal branches of government (the parties to this litigation) recognize the gravity of this matter and have asked this Court to resolve the constitutional questions before the Court without the benefit of intermediary (and prolonged) review from our Court of Appeals. Because MCR 7.305(B)(4) is perfectly satisfied,[10] this Court should forthwith decide the following three questions:

---

[10] Not only would I accept the parties' olive branch and address this matter to maintain comity within our state government, our court rules, namely MCR 7.305(B)(4), emphasize this Court's defined role to determine matters in which:

> (a) delay in final adjudication is likely to cause substantial harm, or

> (b) the appeal is from a ruling that a provision of the Michigan Constitution, a Michigan statute, a rule or regulation included in the Michigan Administrative Code, or any other action of the legislative or executive branches of state government is invalid[.]

My concurring colleagues, by contrast, believe a bypass of the Court of Appeals is not warranted because the Legislature has failed to satisfy the requirements of MCR 7.305(B)(4). In arguing its case to bypass the Court of Appeals, the Legislature asserts:

> Delaying final adjudication would do "substantial harm," as citizens and lawmakers would be left in a state of uncertainty at a time when confident decision-making is a requirement for survival. Michiganders are living under and attempting to interpret orders that never should have been implemented over their Legislature's objection; at the very least, they are living under a cloud of ambiguity that can be rectified by this Court. MCR 7.305(B)(4)(a). The *ultra vires* nature of the Governor's actions puts at risk people who are relying on governmental direction to guide their conduct. Lastly, this appeal involves a ruling that has already declared one related "action of the . . . executive branch[] of state government invalid." MCR 7.305(B)(4)(b). [Alterations in original.]

I am persuaded that the requirements of MCR 7.305(B)(4) are satisfied. As representatives of the people, the Legislature clearly has an interest in providing certainty "at a time when confident decision-making is a requirement for survival." It is no secret that many residents and businesses have struggled to understand the Governor's emergency executive orders related to the COVID-19 virus. See DesOrmeau, *After 102 Executive Orders, Confusion is Commonplace on What's Allowed in Michigan and What Isn't* <https://www.mlive.com/public-interest/2020/05/after-101-executive-orders-confusion-is-commonplace-on-whats-allowed-in-michigan-and-what-isnt.html> (accessed June 2, 2020) [https://perma.cc/K5WK-4RCY]. Further, the Governor makes

(1) whether the Michigan Senate and the Michigan House of Representatives have standing in this case to seek declaratory relief in the Court of Claims,

(2) whether the Governor has continuing authority under the Emergency Management Act (EMA), MCL 30.401 *et seq*., to issue emergency executive orders related to the COVID-19 virus, and

(3) whether the Governor has continuing authority under the emergency powers of the governor act (EPGA), MCL 10.31 *et seq*., to issue emergency executive orders related to the COVID-19 virus.

The members of this Supreme Court, Michigan's court of last resort, have been elected to serve as the final arbiters of law and constitutional questions that are of significant public interest and importance to our state. No issue is of greater public interest or importance than the resolution of whether the Governor was within her constitutional authority to deprive the 10-million-plus residents and the thousands of business owners of Michigan of their personal freedom and economic liberty. Unlike the legislative and executive branches of government, which make and enforce laws through a political process, the judiciary is the nonpolitical branch of government charged with the extremely limited but all-important role of interpreting only those laws and constitutional questions presented in cases and controversies brought to the Court by adversaries in litigation. It is exactly because this Court is the pinnacle of the apolitical branch of government and limited in the scope of its duties that the people trust and accept our resolution of disputes, even when we are sharply divided when rendering our opinions. This is all the more true where, as here, the case presents a constitutional question of significant magnitude that divides our political branches of government. The people of Michigan expect this Court to resolve this dispute. We should do so.

And yet, beyond declining to grant the Legislature's application, the Court's majority also fails to order the Court of Appeals to hear and resolve these issues on an expedited basis. I make no attempt to explicate this failure. Again, both of our coequal branches of government have asked for these significant constitutional questions to be answered as soon as possible. And the people of this state have a great interest in the final disposition of these issues as soon as possible. To the extent a majority of this Court

---

no attempt to rebut the Legislature's assertion that it has been particularly harmed by the Governor's usurpation of Legislative power through her emergency executive orders.

Moreover, even assuming there is a shortcoming in the Legislature's application, that defect is cured by the Governor's application, which expressly invites a challenge to the Court of Claims' holding that the Governor's actions were invalid under the EMA. See MCR 7.305(B)(4)(b). Again, both of our coequal branches of government want these questions answered. We should honor their requests.

has concluded that the wisdom of our intermediate appellate court is essential to our resolution of these weighty issues, there is no reason why this Court should not order the Court of Appeals to hear and decide these questions forthwith. The Court's failure to, at a minimum, require the Court of Appeals to decide these cases on an expeditious basis fails to accord the respect due to our coequal branches of government and displays insensitivity to the people of this state who are entitled to know with certainty whether the constraints of liberty imposed by the emergency orders under which they labor are constitutionally permissible.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

The Court today turns down an extraordinary request by the leaders of our coequal branches of government to immediately hear and decide a case that impacts the constitutional liberties of every one of Michigan's nearly 10 million citizens.[11] See *Walsh v River Rouge*, 385 Mich 623, 639 (1971) ("The invocation of a curfew or restriction on the right to assemble or prohibiting the right to carry on businesses licensed by the State of Michigan involves the suspension of constitutional liberties of the people."). Because I believe we are duty-bound to give our immediate attention to this case, I cannot join an order that nonchalantly pushes it off for another day.

The Governor and the Legislature do not seem to agree on many things these days, but they both agree that this case merits our immediate attention. In addition, since they individually and collectively represent every single resident of our state, one can surmise that the views of the Governor and Legislature represent the diverse views of large numbers of our citizens. They are crying out to this Court for help because there is a significant amount of confusion in our state over what the Governor's executive orders mean and whether they are enforceable.[12] And the instant case is not the only one involving questions regarding the validity of the Governor's actions to combat COVID-

---

[11] Justice CLEMENT is of course correct that this case does not involve a direct claim of a constitutional rights violation. But, since the validity of the Governor's executive orders are at stake, and it is indisputable that those orders impinge on the constitutional liberties of our citizens, it is rudimentary logic—not hyperbole—to say that the case impacts the civil liberties of our citizens.

[12] See, e.g., DesOrmeau, *After 102 Executive Orders, Confusion is Commonplace on What's Allowed in Michigan and What Isn't* <https://www.mlive.com/public-interest/2020/05/after-101-executive-orders-confusion-is-commonplace-on-whats-allowed-in-michigan-and-what-isnt.html> (accessed June 2, 2020) [https://perma.cc/K5WK-4RCY].

19.[13]  A substantive ruling on the merits of this case by our Court would not only provide clarity to the Governor, the Legislature, and the public, but it would also assist the lower courts as they continue to address these issues in other matters.

I agree with Justice ZAHRA that both applications easily satisfy the requirements of our bypass rule, MCR 7.305(B)(4).  As an initial matter, it is clear that our Court has jurisdiction here under MCR 7.303, which governs the jurisdiction of the Supreme Court.  Under MCR 7.303(B)(1), we have discretion to "review by appeal a case pending in the Court of Appeals or after decision by the Court of Appeals (see MCR 7.305)."  Contrary to Justice CLEMENT's suggestion, we have never held that the grounds for discretionary appeal are jurisdictional—I see no reason to do so now.  It is indisputable that our Court has jurisdiction over this case, if we choose to assert it.

The Legislature's bypass application clearly shows that a "delay in final adjudication is likely to cause substantial harm.]"  MCR 7.305(B)(4)(a).  The second question presented in the application is "whether the Emergency Powers of the Governor Act [MCL 10.31 *et seq.*] is consistent with the separation-of-powers doctrine in the Michigan Constitution, where the act . . . results in the usurpation of the Legislature's role in formulating public policy[.]"  The Legislature further asserts that "COVID-19 presents real problems that call for a comprehensive and deliberative governmental response.  The Court should restore the proper constitutional order and allow the branches to get to work—together."[14]  In short, the Legislature is arguing that because the

---

[13] There are at least five other cases involving challenges to COVID restrictions in the lower courts: *Martinko v Governor* (Docket No. 353604); *Slis v Michigan* (Docket No. 351211); *Dep't of Health & Human Servs v Manke* (Docket No. 353607); *Mich United for Liberty v Governor* (Docket No. 353643); and *Associated Builders & Contractors of Mich v Governor* (Docket No. 20-000092-MZ).  Cases concerning the restrictions are also proliferating in the federal courts.  See *Mitchell v Whitmer* (Case No. 1:20-cv-00384) (WD Mich); *League of Indep Fitness Facilities & Trainers, Inc v Whitmer* (Case No. 1:20-cv-00458) (WD Mich); *Allen v Whitmer* (Case No. 2:20-cv-11020) (ED Mich); *Mich United Conservation Clubs v Whitmer* (Case No. 1:20-cv-00335) (WD Mich); *Mich Nursery & Landscape Ass'n v Whitmer* (Case No. 1:20-cv-331) (WD Mich); *Beemer v Whitmer* (Case No. 1:20-cv-323) (WD Mich); *VanderZwaag v Whitmer* (Case No. 1:20-cv-325) (WD Mich); *Martinko v Whitmer* (Case No. 2:20-cv-10931) (ED Mich); *Thompson v Whitmer* (Case No. 1:20-cv-00428) (WD Mich); *Midwest Institute of Health, PLLC v Whitmer* (Case No. 1:20-cv-00414) (WD Mich); *Otworth v Whitmer* (Case No. 1:20-cv-00405-PLM-RSK) (WD Mich); *Signature Sotheby's Int'l Realty, Inc v Whitmer* (Case No. 1:20-cv-00360) (WD Mich).  More are sure to follow.

[14] See also Michigan Legislature's Emergency Bypass Application for Leave to Appeal, p 27 ("In effectively exercising standardless lawmaking authority to formulate public policy rather than the democratic process, the Governor has usurped the Legislature's

Governor has claimed the authority to exercise core legislative powers for an indefinite period, the Legislature has been displaced from its normal constitutional role as the branch with "the authority to make, alter, amend, and repeal laws." *Harsha v Detroit*, 261 Mich 586, 590 (1933). See Const 1963, art 4, § 1 (stating that with certain exceptions not relevant here, "the legislative power of the State of Michigan is vested in a senate and house of representatives"); Const 1963, art 4, § 51 ("The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health."). At the bypass stage, we need not decide the merits of the Legislature's separation-of-powers argument. It is enough to recognize the obvious, substantial, and ongoing institutional harm that is being caused if the Legislature's claim has merit.

Justice CLEMENT asserts, not incorrectly, that the Legislature still has the power to enact laws. But that misses the point of the Legislature's claim. Absent the Governor's extraordinary exercise of core legislative powers during the pandemic, the normal constitutional order would prevail and the Governor and the Legislature would be compelled to work together to shape the public policy of our state. Instead of needing a supermajority vote to override the Governor's veto and restore the *status quo ante*, the Legislature could enact laws and present them to the Governor by a simple majority vote of each house. And the Governor would have an incentive—the one our founders built into our system of government—to work with Legislature to develop bills that she found acceptable and would be willing to sign into law. The Legislature's position, in short, is that by her ongoing and broad exercise of the legislative power, the Governor has usurped its power and diminished its institutional role. Being sidelined from its role in shaping public policy during this pandemic is undoubtedly a substantial harm to the institutional prerogatives of the Legislature.

The concurring justices give even shorter shrift to the Governor's bypass application. For one thing, Justice CLEMENT's concurrence never mentions or purports to apply our bypass rule with regard to the Governor's application. Instead it offers a series of suppositions on topics other than whether the Governor is appealing the invalidation of executive action, which is all that MCR 7.305(B)(4)(b) requires and which is precisely what the Governor seeks to appeal here. The Court of Claims invalidated an executive order, No. 2020-68, which the Governor issued under the Emergency Management Act (EMA), MCL 30.401 *et seq*.

Justice CLEMENT seems to agree that the Governor has met the requirements of MCR 7.305(B)(4)(b). The thrust of Justice CLEMENT's argument is that the Governor

power."); *id.* at 33 ("Nor can the Governor usurp the lawmaking power merely because she disagrees with the Legislature's response to the COVID-19 crisis.").

*might* not be an aggrieved party because, even though the court struck down her order under the EMA, she was able to retain all her substantive regulations in an identical order under the emergency powers of the governor act (EPGA). But the Governor has good reason for feeling that she is aggrieved even if her regulations remain standing at this point in the proceedings. "[T]o have standing on appeal [i.e., to be an aggrieved party], a litigant must have suffered a concrete and particularized injury" arising from the judgment below. *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291 (2006).[15] The Governor argues that the "EMA provides for a more extensive structure of governmental action in response to an emergency, and a more detailed set of powers for the Governor to implement in that response." A comparison of the two statutes at issue displays the EMA's more elaborate provisions. Compare MCL 10.31 (setting forth the Governor's general authority to promulgate orders after proclaiming a state of emergency) with, e.g., MCL 30.408 and MCL 30.409 (establishing emergency manager coordinators across various institutions and entities) and MCL 30.411 (providing limited immunity). And, importantly, the Governor contends that the EMA not only empowers her to act but affirmatively *requires* her to declare an emergency or disaster. Whether these provisions and others differentiate the EMA from the EPGA, so that the statutes do not conflict, goes to the merits of the statutory issue in this case, and thus I would not now suggest an answer. It is enough here that the Governor has raised a colorable argument that the decision below struck down her executive order, effectively cabined her statutory tools, and required her to disregard statutory obligations. This constitutes a concrete and particular injury.

Moreover, consider the implications of Justice CLEMENT's hunch about the Governor's aggrieved-party status. If the Legislature successfully appealed its claims—either here or in the Court of Appeals—and the EPGA no longer authorized Executive Order No. 2020-68, then the Governor would need to fall back on the EMA. But by that point it would doubtless be too late for her to appeal.[16] In other words, the Governor would become aggrieved only when it would be too late for her to do anything about it.[17]

---

[15] See also *Attorney General v Bd of State Canvassers*, 500 Mich 907, 908 n 6 (2016) (ZAHRA and VIVIANO, JJ., concurring) (" 'Aggrieved' is a term of art defined as 'having legal rights that are adversely affected; having been harmed by an infringement of legal rights.' An 'aggrieved party' is 'a party whose personal, pecuniary, or property rights have been adversely affected by another person's actions or by a court's decree or judgment.' Thus, to be 'aggrieved,' a party must demonstrate that it has been harmed in some fashion.") (citations omitted).

[16] Under Justice CLEMENT's logic, it would not be enough for the Governor that the Legislature could satisfy the bypass rule in order for her to bring her appeal.

[17] In addition, Justice CLEMENT's reminder that the Court of Claims' decision is not binding is irrelevant: it would seemingly always be the case that a party seeking to bypass

In sum, because the Governor is appealing the invalidation of her executive actions, her bypass application satisfies MCR 7.305(B)(4)(b). And she also has claimed sufficient injury from the judgment below. If the majority wishes to deny the application on other grounds, so be it. But it should not pretend the Court's hands are tied by our procedural rules.[18]

---

the Court of Appeals will be appealing a nonbinding decision. If this is a meaningful consideration in rejecting a bypass, then one wonders why we have the rule at all.

[18] By denying the bypass, the majority has not only written the bypass court rule out of the rulebook, it has also put us at odds with the highest courts of many other states who have not faltered in their responsibility to timely address the significant legal issues arising from their states' responses to the COVID-19 pandemic. The Pennsylvania Supreme Court, exercising immediate jurisdiction in a challenge to executive orders, said it well: "[T]his case presents issues of immediate and immense public importance impacting virtually all Pennsylvanians and thousands of Pennsylvania businesses, and that continued challenges to the Executive Order will cause further uncertainty." *Friends of Danny DeVito v Wolf*, ___ Pa ___, ___ (2020) (Docket No. 68 MM 2020), slip op at 17. In a similar case, the Kansas Supreme Court exercised expedited original jurisdiction, explaining that such jurisdiction lay when the court "determine[s] the issue is of sufficient public concern. Under the circumstances our state faces, we easily do." *Kelly v Legislative Coordinating Council*, ___ Kan ___, ___ (2020) (Docket No. 122765), slip op at 9 (citation omitted). See also *In re State of Texas*, ___SW3d___ (2020) (Docket No. 20-0394) (addressing whether COVID-19 justified voting by mail); *Seawright v New York City Bd of Elections*, ___ NY2d ___ (2020) (Slip Op No. 02993) (addressing election requirements in light of COVID-19); *Wisconsin Legislature v Palm*, ___ Wis 2d___, ___; 2020 WI 42, ¶ 10 (Wis, May 13, 2020) (exercising original jurisdiction—which covered cases " 'that should trigger the institutional responsibilities of the Supreme Court' "—over the legislature's challenge of executive orders because the "order . . . impacts every person in Wisconsin, as well as persons who come into Wisconsin, and every 'non-essential business' ") (citation omitted); *Cal Attorneys for Criminal Justice v Newsom*, order of the California Supreme Court, entered May 13, 2020 (Case No. S261829), p 1 ("This mandate proceeding, like others that have recently come before this court, raises urgent questions concerning the responsibility of state authorities during the current pandemic to protect the health and safety of inmates . . . in light of the spread of the novel coronavirus . . . ."); *id*. at 4 (Liu, J., dissenting) ("As a prudential matter, we exercise [original mandamus] jurisdiction 'only in cases in which "the issues presented are of great public importance and must be resolved promptly." ' If there is any case where exercising our mandamus jurisdiction is appropriate, this is it.") (citations omitted); *Comm for Pub Counsel Servs v Chief Justice of the Trial Court*, 484 Mass 1029, 1029 (2020) (denying reconsideration of earlier holding that the court had superintending authority "to stay a final sentence that is being served, absent a pending

appeal or a motion for new trial"); *Goldstein v Secretary of the Commonwealth*, 484 Mass 516 (2020) (addressing an election-signature requirement in light of COVID); *In re Abbott*, ___SW3d___, 63 Tex Sup Ct J 909 (2020) (holding that trial judges lacked standing to challenge an executive order applying to bail decisions); *Comm for Pub Counsel Servs v Chief Justice of the Trial Court*, 484 Mass 431, 446 (2020) (exercising general superintendence, under which the court could "remedy matters of public interest 'that may cause further uncertainty within the courts' ") (citation omitted); *Christie v Commonwealth*, 484 Mass 397 (2020) (hearing petition for immediate release from custody due to COVID-19 concerns under the court's general superintendence power); *In re Interrogatory on House Joint Resolution 20-1006*, ___P3d___, ___; 2020 CO 23, ¶ 28 (Colo, 2020) ("We conclude that the interrogatory [by the General Assembly asking for guidance in light of conditions posed by COVID-19 on a constitutional requirement] now before us presents an important question upon a solemn occasion. Accordingly, we exercise original jurisdiction. The General Assembly and the public at large urgently need an answer to the interrogatory to avoid uncertainty surrounding the length of the remaining regular session and its impact on pending bills and bills yet to be introduced."); cf. *Strizich v Mont Dep't of Corrections*, order of the Montana Supreme Court, entered May 5, 2020 (Case No. OP 20-0225) (declining to consider petition for injunctive relief because the case, involving COVID-19 and state correctional facilities, was fact-intensive); *Disability Rights Mont v Mont Judicial Districts 1-22*, order of the Montana Supreme Court, entered April 14, 2020 (Case No. OP 20-0189) (denying petition to exercise mandamus power because the request involved factual issues and the legal contention failed on the merits).

It is noteworthy, too, that in the United States Supreme Court, the significance of the issues would alone justify bypassing the court of appeals. See also Sup Ct Rule 11 ("A petition for a writ of certiorari to review a case pending in a United States court of appeals, before judgment is entered in that court, will be granted only upon a showing that the case is of such *imperative public importance* as to justify deviation from normal appellate practice and to require immediate determination in this Court.") (emphasis added). Indeed, "[t]he writ . . . has been granted in some of the most important cases in [the last] century." Lindgren & Marshall, *The Supreme Court's Extraordinary Power to Grant Certiorari Before Judgment in the Court of Appeals*, 1986 Sup Ct Rev 259, 259 (1986); see *Dames & Moore v Regan*, 453 US 654, 667-668 (1981) ("Arguing that this is a case of 'imperative public importance,' petitioner then sought a writ of certiorari before judgment. Because the issues presented here are of great significance and demand prompt resolution, we granted the petition for the writ, adopted an expedited briefing schedule, and set the case for oral argument on June 24, 1981.") (citations omitted).

\* \* \*

This case involves some of the most important legal principles that can arise in a free society. The parties' briefs reverberate with weighty assertions about our constitutional structure, as well as the need for and the scope of the Governor's emergency powers. These issues, and how we decide them, will have a direct impact on the constitutional liberties of every person who lives or owns property in, or simply visits, our state while the restrictions are in place. On a fundamental and practical level, they impact how our friends and neighbors live their lives on a daily basis, where they can go, with whom, how and when they can practice their religion, whether they can go out to eat or to the hardware store or to the beach—in short, nearly every decision they make about nearly everything that they do. Our Court exists to vindicate the constitutional rights of our citizens and to be the final expositor of state law; thus, we are uniquely situated to provide a prompt and final resolution of the issues presented in this case.

The leaders of our state government believe we should hear this case now. I agree. But instead of rising to the occasion, the majority order dodges these issues for now and defers them to the lower courts so they can weigh in first. Ordinarily, I would agree with this approach. But this is no ordinary case. It should not simply go on the conveyor belt with all of the others. Because my colleagues have decided to put it there at least for the time being, I respectfully dissent.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 4, 2020



Clerk

s0601