*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HOUSE OF REPRESENTATIVES and SENATE,

          Plaintiffs-Appellants/Cross-Appellees,

and

JOHN F. BRENNAN, MARK BUCCHI, SAMUEL
H. GUN, MARTIN LEAF, and ERIC ROSENBERG,

          Cross-Appellants,

v

GOVERNOR,

          Defendant-Appellee/Cross-
          Appellant/Cross-Appellee.

FOR PUBLICATION
August 21, 2020
9:00 a.m.

No. 353655
Court of Claims
LC No. 20-000079-MZ

Before: MARKEY, P.J., and K. F. KELLY and TUKEL, JJ.

MARKEY, P.J.

Plaintiffs, the Michigan House of Representatives and the Michigan Senate (the Legislature), appeal by right the opinion and order of the Court of Claims granting a declaratory judgment in favor of defendant, the Governor of Michigan, with respect to the Governor's authority to extend a state of emergency and to issue associated executive orders under the emergency powers of governor act (EPGA), MCL 10.31 *et seq.* The Court of Claims additionally concluded, however, that actions taken by the Governor under the Emergency Management Act (EMA), MCL 30.401 *et seq.*, were ultra vires. The Governor has filed a cross-appeal in regard to that ruling and also takes issue with the determination by the Court of Claims that the Legislature had standing to file suit and seek declaratory relief. Prospective intervenors John F. Brennan, Mark Bucchi, Samuel H. Gun, Martin Leaf, and Eric Rosenberg, all of whom are attorneys, cross appeal the denial of their motion to intervene in this lawsuit. Proceeding on the assumption that the Legislature had standing to sue, we hold that the Governor's declaration of a state of emergency, her extension of the state of emergency, and her issuance of related executive orders fell within the scope of the Governor's authority under the EPGA. We further hold that the EPGA is constitutionally sound. We therefore decline to address whether the Governor was additionally

authorized to take those same measures under the EMA and whether the Governor violated the EMA: the matters are moot. Finally, we hold that there is no basis to reverse the order of the Court of Claims denying the motion to intervene. In sum, we affirm on the issues necessary to resolve this appeal.

## I. PREFACE

This case arises out of a worldwide pandemic involving the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), which causes the disease known as COVID-19. In an effort to combat the spread of COVID-19 in Michigan, the Governor declared and extended a state of emergency and issued numerous executive orders in connection with the emergency. This lawsuit stems from a dispute between the Governor and the Legislature regarding the scope of the Governor's authority to issue, implement, and extend those emergency-based executive orders. We are not called upon nor is it our role to examine and resolve issues concerning the nature of COVID-19, the data related to the disease, the statistical or human impact of COVID-19 on Michiganders, whether emergency circumstances justifying the executive orders existed, or the appropriateness of the measures the Governor has taken in tackling COVID-19. Rather, we are presented with pure procedural and legal issues, including whether the Legislature had standing to bring suit against the Governor, whether the Governor's declarations and orders exceeded her constitutional and statutory authority, whether the EPGA violates the separation of powers and attendant nondelegation doctrine, and whether the prospective intervenors were entitled to intervene in the suit.

## II. CONSTITUTIONAL AND STATUTORY FRAMEWORK

In Michigan, "[t]he powers of government are divided into three branches: legislative, executive and judicial." Const 1963, art 3, § 2. And "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." *Id.* "[T]he legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. "[T]he executive power is vested in the governor." Const 1963, art 5, § 1.

In 1945, the Legislature enacted the EPGA. 1945 PA 302. The EPGA was later amended pursuant to 2006 PA 546. MCL 10.31 currently provides:

> (1) During times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger of a public emergency of that kind, when public safety is imperiled, either upon application of the mayor of a city, sheriff of a county, or the commissioner of the Michigan state police or upon his or her own volition, the governor may proclaim a state of emergency and designate the area involved. After making the proclamation or declaration, the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control. Those orders, rules, and regulations may include, but are not limited to, providing for the control of traffic, including public and private transportation, within the area or any section of the area; designation of specific zones within the area in which occupancy and

use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated; control of places of amusement and assembly and of persons on public streets and thoroughfares; establishment of a curfew; control of the sale, transportation, and use of alcoholic beverages and liquors; and control of the storage, use, and transportation of explosives or inflammable materials or liquids deemed to be dangerous to public safety.

(2) The orders, rules, and regulations promulgated under subsection (1) are effective from the date and in the manner prescribed in the orders, rules, and regulations and shall be made public as provided in the orders, rules, and regulations. The orders, rules, and regulations may be amended, modified, or rescinded, in the manner in which they were promulgated, from time to time by the governor during the pendency of the emergency, but shall cease to be in effect upon declaration by the governor that the emergency no longer exists.

(3) Subsection (1) does not authorize the seizure, taking, or confiscation of lawfully possessed firearms, ammunition, or other weapons.

Notably, MCL 10.31 does not provide any active role for the Legislature during a public emergency, let alone the power to directly act as a check against a governor's exercise of authority under the EPGA. Our Supreme Court has recognized that "the emergency powers granted to the Governor by Act 302 are exclusive." *Walsh v City of River Rouge*, 385 Mich 623, 640; 189 NW2d 318 (1971). With respect to the EPGA, the Legislature expressly articulated its intent, explaining:

It is hereby declared to be the legislative intent to invest the governor with sufficiently broad power of action in the exercise of the police power of the state to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster. *The provisions of this act shall be broadly construed to effectuate this purpose*. [MCL 10.32 (emphasis added).]

A violation of any order, rule, or regulation promulgated by a governor under the EPGA is punishable as a misdemeanor if the order, rule, or regulation expressly states that a violation constitutes a misdemeanor. MCL 10.33.

A little over 30 years later, the Legislature enacted the EMA. 1976 PA 390. The EMA has been amended a couple of times since its inception. See 1990 PA 50; 2002 PA 132. Section 3 of the EMA provides:

(1) The governor is responsible for coping with dangers to this state or the people of this state presented by a disaster or emergency.

(2) The governor may issue executive orders, proclamations, and directives having the force and effect of law to implement this act. . . . [A]n executive order, proclamation, or directive may be amended or rescinded by the governor.

(3) The governor shall, by executive order or proclamation, declare a state of disaster if he or she finds a disaster[1] has occurred or the threat of a disaster exists. The state of disaster shall continue until the governor finds that the threat or danger has passed, the disaster has been dealt with to the extent that disaster conditions no longer exist, or until the declared state of disaster has been in effect for 28 days. *After 28 days, the governor shall issue an executive order or proclamation declaring the state of disaster terminated, unless a request by the governor for an extension of the state of disaster for a specific number of days is approved by resolution of both houses of the legislature. . . . .*

(4) The governor shall, by executive order or proclamation, declare a state of emergency if he or she finds that an emergency has occurred or that the threat of an emergency exists. The state of emergency shall continue until the governor finds that the threat or danger has passed, the emergency has been dealt with to the extent that emergency conditions no longer exist, or until the declared state of emergency has been in effect for 28 days. *After 28 days, the governor shall issue an executive order or proclamation declaring the state of emergency terminated, unless a request by the governor for an extension of the state of emergency for a specific number of days is approved by resolution of both houses of the legislature. . . . .* [MCL 30.403 (emphasis added).]

As reflected in MCL 30.403, if a governor wishes to extend an existing state of disaster or emergency beyond 28 days, the Legislature must approve the extension by resolution. In that respect, the EMA diverges from the EPGA. Of substantial significance, the EMA expressly provides that it shall not be construed to "[l]imit, modify, or abridge the authority of the governor to proclaim a state of emergency pursuant to Act No. 302 of the Public Acts of 1945, being sections 10.31 to 10.33 of the Michigan Compiled Laws," i.e., the EPGA.

## III. BACKGROUND AND PROCEDURAL HISTORY

## A. THE GOVERNOR ACTS IN RESPONSE TO COVID-19 CASES IN MICHIGAN

On March 10, 2020, in Executive Order (EO) 2020-4, the Governor declared a state of emergency due to the escalation of COVID-19 cases and deaths in Michigan. The legal authorities the Governor cited in support of the declaration were the EMA, the EPGA, and Const 1963, art 5, § 1. Among other actions, the Governor closed elementary and secondary schools in EO 2020-5, barred visitors to healthcare facilities under EO 2020-6, shuttered restaurants and bars in EO 2020-9, and restricted nonessential medical and dental procedures pursuant to EO 2020-17. The Governor issued the first stay-at-home directive on March 24, 2020, under EO 2020-21, which also identified various exceptions and parameters in regard to the mandate and criteria with which to evaluate whether to maintain, intensify, or relax restrictions in the future.

---

[1] The statutory definition of "disaster" includes an "epidemic." MCL 30.402(e).

-4-

On April 7, 2020, both chambers of the Legislature adopted Senate Concurrent Resolution No. 24 (2020), which indicated approval of the Governor's declaration of a state of emergency or disaster[2] and, consistent with the EMA, set an expiration date of April 30, 2020, in respect to the duration of the declared emergency. On April 9, 2020, the Governor issued EO 2020-42, which rescinded EO 2020-21, opined that the SARS-CoV-2 continued to be aggressive and a threat to public health, and which extended the stay-at-home directive until April 30, 2020. On April 24, 2020, the Governor issued EO 2020-59, rescinding EO 2020-42 and extending the stay-at-home order until May 15, 2020.

B. THE DISPUTE BETWEEN THE LEGISLATURE AND THE GOVERNOR ARISES

On April 27, 2020, the Governor, as required by the EMA, asked the Legislature to extend the state of emergency. The Legislature declined to pass a resolution extending the state of emergency. Instead, the Legislature passed 2020 SB 858, which provided that "[n]otwithstanding the termination of the underlying state of disaster or state of emergency declaration under this act," more than two dozen of the Governor's EOs would be extended with end dates varying from April 30, 2020, to December 31, 2020. Despite extending some of the EOs under 2020 SB 858, the Legislature essentially sought to reopen Michigan businesses subject to precautionary measures recommended by the Centers for Disease Control and Prevention, with those measures scheduled to expire on May 30, 2020, under the proposed legislation. The Legislature submitted 2020 SB 858 to the Governor on April 30, 2020. The Governor vetoed the bill.

On April 30, 2020, the Governor issued EO 2020-66. The EO noted that the coronavirus remained "present and pervasive in Michigan," that "[t]he health, economic, and social harms of the COVID-19 pandemic" remained "widespread and severe," and that the danger continued to "constitute a statewide emergency and disaster." The order indicated that a statewide response was necessary to save lives, protect public health and safety, and to avert catastrophe, while acknowledging the effects on the economy and society as a whole. EO 2020-66 observed that the Legislature, "despite the clear and ongoing danger to the state," refused to extend the state of emergency pursuant to the EMA. EO 2020-66 terminated the state of emergency under and as required by the EMA.

That same day, however, the Governor issued EO 2020-67, which cited the EPGA as supporting legal authority for this order. EO 2020-67 was issued one minute after EO 2020-66 was released. EO 2020-67 included language from the EPGA, and it declared that a state of emergency was to remain in place. Quoting MCL 10.31(2), the order provided that the state of emergency would cease " 'upon declaration by the governor that the emergency no longer exists.' " EO 2020-67 did set a discontinuation date of May 28, 2020, subject to evaluation by the Governor before expiration in order for her to assess whether the state of emergency should continue beyond that date. The Governor then issued EO 2020-68 *pursuant to the EMA*, declaring—anew—a state of emergency across Michigan. This order was made effective

---

[2] Hereafter, for ease of reference, we shall simply refer to a state of "emergency," which shall also encompass a state of "disaster," unless otherwise indicated.

immediately and was scheduled to continue through May 28, 2020. EO 2020-68 indicated that the Governor would evaluate the continuing need for the order before its expiration. EOs 2020-67 and 2020-68 extended the life of various earlier EOs.[3]

## C. THE LEGISLATURE COMMENCES SUIT AGAINST THE GOVERNOR IN THE COURT OF CLAIMS

The slew of EOs the Governor issued on April 30, 2020, triggered an immediate response from the Legislature. On April 30th, the Senate adopted a resolution authorizing the Senate Majority Leader to commence legal action on behalf of the Senate challenging the Governor's authority to extend or redeclare a state of emergency; the House adopted a similar resolution.

On May 6, 2020, the Legislature filed suit in the Court of Claims against the Governor alleging that EO 2020-67 (April 30, 2018 order keeping a state of emergency in place under the EPGA) and EO 2020-68 (April 30, 2018 order redeclaring a state of emergency under the EMA) were invalid.[4] The Legislature contended that the Governor's actions were not statutorily or constitutionally authorized. The Legislature alleged a violation of the EMA in Count I, a violation of the EPGA in Count II, a violation of Const 1963, art 5, § 1, in Count III, and a violation of the Separation of Powers Clause, Const 1963, art 3, § 2, in Count IV. Additionally, the Legislature moved for a declaratory judgment, asking the Court of Claims to declare that the Governor's EOs were ultra vires. In particular, the Legislature requested the following declarations:

1. The Governor's authority to act under the EMA ended April 30, 2020;

2. The EPGA does not provide authority for the Governor's COVID-19 executive orders;

---

[3] EOs 2020-67 and 2020-68 were later rescinded by orders that themselves were subsequently rescinded. The Governor eventually extended the state of emergency pursuant to EO 2020-165, which order is set to expire on September 4, 2020, subject to evaluation of the need to continue the state of emergency. EO 2020-165 stated:

> This order constitutes a state of emergency declaration under the Emergency Powers of the Governor Act of 1945. Subject to the ongoing litigation, and the possibility that current rulings may be overturned or otherwise altered on appeal, and to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act of 1976 when emergency and disaster conditions exist yet the legislature has not granted an extension request, this order constitutes a state of emergency and state of disaster declaration under that act.

[4] Although these two particular EOs have been rescinded, the dispute remains very much alive given the subsequent EOs the Governor has issued. Accordingly, the lawsuit is not moot. See *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998).

3. The Governor has no lawmaking power under Const 1963, art 5, § 1; and

4. The Governor's ongoing COVID-19 executive orders violate the separation of powers.

The Governor responded that the complaint did not satisfy the verification requirement of MCL 600.6431(2)(d).[5] The Governor further argued that the Legislature lacked standing because it had no special interest at stake and could not meet the obligation to show an actual controversy under MCR 2.605. The Governor also insisted that she had authority under both the EPGA and the EMA to declare states of emergency and to issue orders to protect the residents of Michigan. The Governor additionally posited that the standards contained in the EPGA protected against any claim that the Legislature improperly delegated its lawmaking or legislative power to the executive branch when it enacted the EPGA. Thus, there was no violation of the Separation of Powers Clause.

The Legislature replied that it had standing because it held a special and unique interest in the case where the Governor had nullified a legitimate legislative decision not to authorize continuation of the state of emergency. The Legislature also asserted that it had established the existence of an actual controversy for purposes of seeking declaratory relief under MCR 2.605. The Legislature disputed that the EMA granted the Governor continuing authority to act alone beyond the initial 28-day period of a state of emergency, contending that to so rule would render the legislative-approval provision in MCL 30.402 obsolete. Furthermore, the Legislature maintained that the EPGA did not provide the Governor with boundless authority and that the EPGA infringed upon the separation of powers.

## D. THE EFFORT TO INTERVENE

Cross-appellants, five individual attorneys, moved to intervene in the lawsuit, arguing that they "enthusiastically agreed" with the Legislature but wanted the Court of Claims to remember that attorneys had an interest in "being free of unlawful and arbitrary strictures on [their] personal and professional activities." The Legislature expressed concerns about a potential delay should the Court of Claims choose to grant the motion to intervene, insisting that the Legislature adequately represented the position of prospective intervenors. The Governor opposed intervention on the basis of the purported delay that would occur by allowing the attorneys into the suit. The Governor indicated that prospective intervenors would be more appropriately heard as amici curiae.

The Court of Claims denied the motion to intervene, reasoning that the Legislature adequately represented the interests of the five attorneys. The Court of Claims also determined that issues that would be created by allowing intervention were outside the focus of the case and

---

[5] MCL 600.6431(2)(d) requires that a complaint filed in the Court of Claims contain, among other things, "[a] signature and verification by the claimant before an officer authorized to administer oaths."

that intervention would cause a delay in the proceedings. The Court of Claims permitted the five cross-appellants to be received as amici curiae.

## E. OPINION AND ORDER OF THE COURT OF CLAIMS

The Court of Claims conducted a hearing on the issues posed in the case and permitted extensive arguments by the parties. Subsequently, the Court of Claims issued a written opinion and order. The Court of Claims first disposed of the Governor's argument regarding the verification requirement of MCL 600.6431(2)(d). Considering that the Governor acknowledged that a subsequent filing by the Legislature was notarized in accordance with the statute, the Court of Claims determined that the issue was moot and declined to analyze it.

The Court of Claims next addressed the question of the Legislature's standing to bring the action and obtain relief, framing the issue as "whether the Governor's issuance of EO 2020-67 and/or 2020-68 had the effect of nullifying the Legislature's decision to decline to extend the states of emergency/disaster." It cited with approval federal caselaw from the Sixth Circuit of the United States Court of Appeals holding that legislators have standing to sue when arguing that their votes had been nullified. The Court of Claims also noted that the Sixth Circuit had indicated that a completely nullified legislative vote is a sufficiently concrete injury to the Legislature's interest as to support standing. The Court of Claims distinguished *League of Women Voters v Secretary of State,* __ Mich App __; __ NW2d __ (2020), because the Legislature here was not seeking court resolution of a lost political battle; it was instead alleging that the Governor's actions uniquely injured it by nullifying an act of the body as a whole. The Court of Claims concluded that the Legislature had standing.

The Court of Claims next made short shrift of the Governor's reliance on Const 1963, art 5, § 1, which vested her with executive power, in providing her the requisite authority to issue the EOs. The Court of Claims observed that the Governor did not assert that she had authority to issue the EOs solely on the basis of the constitutional provision and absent enabling legislation.

The Court of Claims next examined the EPGA, explaining that it bestowed broad authority on the Governor to declare a state of emergency and to act to bring the emergency under control. The Court of Claims rejected the Legislature's attempt to restrict the scope of the EPGA to only local or regional emergencies, stating that that argument was inconsistent with the EPGA's plain language, which casts a much wider net. The Court of Claims discounted the Legislature's argument that when the EPGA and EMA are read together, it is apparent that the EPGA was not intended to address statewide concerns. The Court of Claims opined that the Legislature itself harmonized the two acts when it expressly provided that nothing in the EMA was intended to limit a state of emergency proclaimed under the EPGA. The Court of Claims rebuffed the argument that the legislative history of the EPGA revealed a limitation to local matters, determining in part that the Legislature was relying on "mere generalities and anecdotal commentary."

The Court of Claims likewise dispatched the Legislature's argument that the Governor's EOs violated the separation of powers. It relied on caselaw holding that the Legislature may, without violating the Separation of Powers Clause, obtain the assistance of the executive branch, provided the Legislature sets forth adequate standards. The Court of Claims concluded that the EPGA contained sufficient standards and criteria to guide a governor's declaration of an

emergency and to issue associated EOs, including the requirement that orders be reasonable and necessary under the circumstances. The Court of Claims determined that the Legislature's challenge of the EPGA was meritless and that the Legislature had failed to establish grounds to invalidate the EOs predicated on the EPGA.

Finally, the Court of Claims turned to the validity of EO 2020-68, in which the Governor redeclared a state of emergency under the EMA. The Court of Claims opined that nothing in the EMA precluded legislative extension for multiple 28-day periods. According to the Court of Claims, the Governor's redeclaration of an emergency occurred only because the initial 28-day period had expired without renewal, not because the emergency had ceased to exist and then reemerged. The Court of Claims focused on the language in the EMA providing that a governor "shall issue an executive order" declaring the emergency terminated absent the Legislature's approval of an extension by resolution. MCL 30.403(3) and (4). The Court of Claims characterized the 28-day statutory limit in MCL 30.403 as a restriction imposed on gubernatorial authority. It indicated that the Legislature limited the time in which the Governor could act independently in responding to a specific emergency. The Court of Claims ruled that because the Legislature did not extend the emergency by resolution upon request by the Governor, the Governor's issuance of EO 2020-68 was ultra vires under the EMA.

## IV. ANALYSIS

## A. STANDING

We conclude that the Governor's declaration and extensions of a state of emergency, along with the associated EOs, were actions all falling within the scope of the Governor's authority under the constitutionally-sound EPGA. Our holding renders moot issues concerning whether the Governor was additionally authorized to take those same measures under the EMA or whether the Governor violated the EMA. The Legislature is thus not entitled to relief even if it has the requisite standing to sue the Governor. In light of this highly expedited appeal, we shall proceed on the assumption that the Legislature had standing to file suit against the Governor for declaratory relief.

## B. THE EPGA

## 1. STANDARD OF REVIEW

We review de novo as a question of statutory interpretation whether the Governor exceeded the power granted her by statute. See *Mich Gun Owners, Inc v Ann Arbor Pub Sch*, 502 Mich 695, 702; 918 NW2d 756 (2018). "That means that we review it independently, with no required deference to the trial court." *Id.* "Likewise, this Court reviews de novo constitutional questions, including those concerning the separation of powers." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013).

## 2. RULES OF STATUTORY CONSTRUCTION

In *Slis v Michigan*, __ Mich App __, __; __ NW2d __ (2020); slip op at 12, this Court recited the well-established principles of statutory construction, observing:

This Court's role in construing statutory language is to discern and ascertain the intent of the Legislature, which may reasonably be inferred from the words in the statute. We must focus our analysis on the express language of the statute because it offers the most reliable evidence of legislative intent. When statutory language is clear and unambiguous, we must apply the statute as written. A court is not permitted to read anything into an unambiguous statute that is not within the manifest intent of the Legislature. Furthermore, this Court may not rewrite the plain statutory language nor substitute its own policy decisions for those decisions already made by the Legislature.

Judicial construction of a statute is only permitted when statutory language is ambiguous. A statute is ambiguous when an irreconcilable conflict exists between statutory provisions or when a statute is equally susceptible to more than one meaning. When faced with two alternative reasonable interpretations of a word in a statute, we should give effect to the interpretation that more faithfully advances the legislative purpose behind the statute. [Quotation marks and citations omitted.]

## 3. DISCUSSION AND RESOLUTION – SCOPE AND EXTENT OF AUTHORITY

The Legislature argues that the Governor cannot use the EPGA to justify an indefinite statewide emergency. The Legislature further contends that the Court of Claims created an irreconcilable conflict between the EPGA and the EMA with its construction of the two acts. The Legislature also maintains that the text of the EPGA and its historical context establish that the EPGA is intended to address emergencies that are confined to the local level and not statewide emergencies. As an overview of its position, the Legislature asserts as follows:

All parties agree that the EPGA and the EMA cover the same subject matter. Under fundamental principles of statutory construction, they must be harmonized and read so that every word in both statutes is given meaning. Only the Legislature has offered such a reading here: the EPGA is for localized issues, while the EMA can reach as widely as a statewide disaster. The Court of Claims's adoption of the Governor's position—that the statutes independently authorize every single action she has taken—renders ever[y] word of the 1976 EMA's 12 pages of text surplusage. This Court should reverse.

We hold that the plain and unambiguous language of the EPGA and the EMA does not support the Legislature's position. We begin by dissecting the EPGA's language to determine whether the EPGA's application was intended to be restricted to local emergencies. The first sentence of MCL 10.31(1) provides:

During times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger of a public emergency of that kind, when public safety is imperiled, either upon application of the mayor of a city, sheriff of a county, or the commissioner of the

Michigan state police or upon his or her own volition, the governor may proclaim a state of emergency and designate the area involved.

It hardly sounds as if the Legislature were focused solely on local emergencies when speaking in terms of a great public crisis, disaster, catastrophe, or similar emergency that imperils public safety. Indeed, its use of the adjective "great" instead suggests legislative contemplation of an emergency that is expansive or substantial, not merely a local emergency. A statewide outbreak of disease such as COVID-19 can certainly constitute a great public crisis, disaster, or catastrophe, and it undoubtedly can imperil public safety. Although "rioting" occurs most often in a limited area, statewide rioting can happen. Moreover, rioting is but one example of a public emergency listed in MCL 10.31(1). The statutory language also plainly states the public emergency must exist "within the state." *Id.* Contrary to the Legislature's strained interpretation, an emergency "within" our state can patently encompass not only a local emergency but also a statewide emergency affecting all of Michigan. There can be no dispute that the spread of COVID-19 was and is occurring "within the state" of Michigan. The prepositional phrase "within the state" clearly does not restrict the emergencies the EPGA contemplates to isolated emergencies in local communities. A single Michigan county can be described as being "within the state," but the same is true when discussing all 83 of Michigan's counties viewed together as a whole: they are "within the state." The Legislature could have easily expressed that the EPGA pertains only to public emergencies within a village, city, township, county, or other unit of governance, or the Legislature could have stated that the EPGA does not apply to statewide emergencies, *but it did not do so*.[6] The language the Legislature chose likely reflected the unremarkable and self-evident proposition that emergencies occurring outside the state did not implicate the EPGA.

With respect to the language in the first sentence of MCL 10.31(1) referring to an application for a declaration of emergency from a mayor, county sheriff, state police commissioner, or a governor acting on his or her own volition, we easily determine that the language is broad enough to encompass the occurrence of either a localized or a statewide emergency. While an application by a mayor or a county sheriff would likely relate to a local emergency, an application by a state police commissioner[7] or governor could unquestionably concern a statewide emergency.

The concluding language in the first sentence of MCL 10.31(1) provides that a "governor may proclaim a state of emergency and *designate the area involved*." (Emphasis added.) The

---

[6] Our review of the Michigan Compiled Laws reveals that the Legislature has used the phrase "within the state" on numerous occasions in various contexts with the indisputable intent to include the entire state of Michigan. For example, the Insurance Code of 1956 provides that the insurance commissioner may restrict the solicitation of new business "within the state." MCL 500.437(5). The Revised Judicature Act of 1961 establishes jurisdiction of the courts over corporations that conduct general business "within the state." MCL 600.711(3). As yet another example, the rules of the State Higher Education Facilities Commission relate to institutions of higher education "within the state." MCL 390.44.

[7] "The [state police] commissioner shall formulate and put into effect plans and means of cooperating with the local police and peace officers *throughout the state* . . . ." (Emphasis added.)

-11-

emphasized language plainly does not preclude the declaration of a state of emergency that designates the entire state as the "area involved." There is no restrictive or limiting language with respect to the term "area," and "area" simply means, in pertinent part, "a geographic region." *Merriam-Webster's Collegiate Dictionary* (11th ed). Were we to exclude the "state" as a whole from constituting the "area" subject to an order, rule, or regulation under the EPGA, we would be reading language into an unambiguous statutory provision and rewriting the plain language of the EPGA. That we may not do.

The second sentence of MCL 10.31(1) provides that "[a]fter making the proclamation or declaration [of a state of emergency], the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation *within the affected area* under control." (Emphasis added.) The prepositional phrase "within the affected area" is plain and unambiguous. Consequently, for the reasons discussed above in examining the term "area" and the phrase "within the state," the language can concern a local emergency or a statewide emergency depending on the extent of the public crisis, disaster, or catastrophe. An "affected area" can span the entire state, especially with respect to a contagious disease, thereby establishing a statewide emergency that needs to be controlled. Additionally, and quite obviously, a governor's efforts under the EPGA "to protect life and property" can extend to the lives and property of persons in a local community or the lives and property of everyone in Michigan.

Keeping our attention on the EPGA for now, we note that the last sentence of MCL 10.31(1) provides:

> Th[e] orders, rules, and regulations may include, but are not limited to, providing for the control of traffic, including public and private transportation, within the area or any section of the area; designation of specific zones within the area in which occupancy and use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated; control of places of amusement and assembly and of persons on public streets and thoroughfares; establishment of a curfew; control of the sale, transportation, and use of alcoholic beverages and liquors; and control of the storage, use, and transportation of explosives or inflammable materials or liquids deemed to be dangerous to public safety.

There in nothing in the plain and unambiguous language of this provision that limits or restricts the use of orders, rules, and regulations to solely confront local emergencies; the language is broad enough to include statewide emergencies. We have already dispensed with the arguments regarding the word "area." And all of the specific examples of orders, rules, and regulations can apply in a limited manner at a local level or in an extensive manner at a statewide level. For example, during a state of emergency, a governor could regulate the use of buildings in a small town or across the entire state.

Without yet considering the EMA, pursuant to the plain and unambiguous language of the EPGA, we conclude that a governor has the authority to declare a *statewide* emergency and to promulgate reasonable orders, rules, and regulations during the pendency of the statewide emergency as deemed necessary by the governor, and which the governor can amend, modify, or rescind. Additionally, a declared statewide emergency only ends upon the governor's declaration

that the emergency no longer exists.  That has yet to occur in the instant case.  As noted earlier in this opinion in regard to the EPGA, the Legislature specifically declared that its intent was "to invest the governor with sufficiently *broad power of action* in the exercise of the police power of the state to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster."  MCL 10.32 (emphasis added).  Our conclusion regarding the breadth of the EPGA and that it pertains to statewide emergencies is entirely consistent with the expressed legislative purpose of the EPGA.[8]

The Legislature argues that the EPGA must be harmonized with the EMA and that a distinguishing feature between the two acts must be recognized because if they are effectively interchangeable and a governor can pick and choose which statute to invoke as he or she likes, the EMA and its requirement of legislative approval to extend a state of emergency are rendered surplusage.  The Legislature contends that to distinguish the acts so as to make it possible to read them in harmony and give the EMA meaning, it is incumbent upon us to limit or restrict a governor's authority under the EPGA to local emergencies.  Again, the Legislature maintains that only the EMA applies to statewide emergencies.

When two or more statutes arguably relate to the same subject or have the same purpose, the statutes are deemed *in pari materia* and must be read together in order to discern legislative intent.  *Measel v Auto Club Group Ins Co*, 314 Mich App 320, 329 n 7; 886 NW2d 193 (2016).  The purpose of the rule of *in pari materia* is to effectuate the legislative goal as evinced by the harmonious statutes on a particular subject.  *Id.*  "When two statutes are *in pari materia* but conflict with one another on a particular issue, the more specific statute must control over the more general statute."  *Donkers v Kovach*, 277 Mich App 366, 371; 745 NW2d 154 (2007).  "It is . . . well established that a later-enacted specific statute operates as an exception or a qualification to a more general prior statute covering the same subject matter and that, if there is an irreconcilable conflict between two statutes, the later-enacted one will control."  *In re Midland Publishing Co, Inc*, 420 Mich 148, 163; 362 NW2d 580 (1984).  These are statutory-construction doctrines designed to discern the intent of the Legislature.

There can be no dispute that the EMA is much more comprehensive, specific, and detailed than the EPGA, that the EPGA is the older legislation, and that the EMA explicitly defines a disaster as including an "epidemic," MCL 30.402(e).  The Legislature relies on the doctrines of

---

[8] Citing a 1945 newspaper article and a message from Governor William Milliken to the Speaker of the House of Representatives in the 1970s, the Legislature argues that the historical context of the EPGA reveals that it was intended for local matters, specifically rioting and civil disturbances.  Extrinsic materials may play a role in statutory construction only to the extent that they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous language.  *McCormick v Carrier*, 487 Mich 180, 221; 795 NW2d 517 (2010).  "[T]he duty of this Court is to construe the language of Michigan's statutes before turning to secondary sources . . . ."  *Gerling Konzern Allgemeine Versicherungs AG v Lawson*, 472 Mich 44, 57; 693 NW2d 149 (2005).  Here, the clear and unambiguous language of the EPGA indicates that it applies to more than rioting and that it can encompass statewide emergencies; consequently, the secondary sources cited by the Legislature are of no relevance, nor are they inherently inconsistent with our analysis.

statutory interpretation mentioned above in its effort to persuade us that the EPGA must be construed to apply only to local emergencies. Given our earlier conclusion that the EPGA, when considered solely on the basis of the language in the EPGA, provides a governor with broad authority to issue orders to confront local as well as statewide emergencies, were we to adopt the Legislature's argument, we would effectively be limiting, modifying, and abridging the EPGA. Our doing so would be in direct contravention of the Legislature's directive in § 17 of the EMA, which provides that the EMA "shall not be construed to . . .

> [l]imit, modify, or abridge the authority of the governor to proclaim a state of emergency pursuant to Act No. 302 of the Public Acts of 1945, being sections 10.31 to 10.33 of the Michigan Compiled Laws, or exercise any other powers vested in him or her under the state constitution of 1963, statutes, or common law of this state independent of, or in conjunction with, this act. [MCL 30.417(d).]

The purpose of this provision is evident on its face and undeniable—the Legislature sought to arm a governor with a full legal arsenal to combat a public emergency, not just the EMA, but also the EPGA, other pertinent statutes, the Michigan Constitution, and even the common law, in conjunction with or independent of the EMA. MCL 30.417(d) does not permit us to use language in the EMA to diminish the reach and scope of the EPGA. The judiciary does not legislate.

Although the EMA specifically refers to an epidemic, we have determined that the EPGA would also cover a statewide emergency involving a contagious disease such as COVID-19, or in other words, an epidemic, which, because of COVID-19's worldwide reach, is coined a pandemic. If, despite this conclusion, we held that only the EMA is implicated for purposes of ascertaining a governor's authority to address an epidemic or a pandemic, we would offend MCL 30.417(d) and its mandate not to diminish a governor's authority to act under the EPGA. We cannot employ statutory-construction principles or doctrines used to discern legislative intent to produce an interpretation that conflicts with an *explicit declaration* of the Legislature's intent. See *People v Mazur*, 497 Mich 302, 314; 872 NW2d 201 (2015) (where the Legislature actually expressed a clear intent, application of the *in pari materia* doctrine to find a contrary legislative intent would not be proper). The Legislature's general argument is contrary to the plain and unambiguous language of the EPGA, specifically MCL 10.31, and the EMA, specifically MCL 30.417(d).[9]

Our concurring and dissenting colleague constructs most of his statutory stance on the basis that the EMA specifically references an "epidemic," concluding that this established that the EPGA was never intended to cover epidemics. We rejected this view for the reasons discussed

---

[9] At oral argument, counsel for the Legislature responded to a query by this panel whether a governor could have acted on a statewide basis under the EPGA had the pandemic struck in 1975, a year before the EMA was enacted. Counsel replied in the negative, but also suggested that the EPGA could have been used on a county-by-county approach to address the hypothetical 1975 pandemic. This answer appears to accept that a governor can use the EPGA to address a statewide crisis, but would apparently have to do so in a laborious, fragmented fashion, categorizing each county separately. Regardless, the alleged distinction between local and statewide emergencies simply finds no support in the statutory language.

above. We also note that the Legislature does not even make the particular argument formulated by the dissent-concurrence in its brief, nor did it make the argument to the Court of Claims. Our colleague agrees that the argument actually posed by the Legislature—the EPGA solely addresses local emergencies and the EMA concerns both local and statewide emergencies—lacks merit. Although it is the Legislature's position that the EPGA does not encompass statewide epidemics, it did not contend in its brief on appeal that the EPGA did not cover localized or regional epidemics or epidemics in general. Indeed, as noted earlier, the Legislature conceded that the parties agreed that the two acts "cover the same subject matter." This is akin to a waiver of the issue. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

Again, MCL 30.417(d) precludes construction of the EMA to "[l]imit, modify, or abridge the authority of the governor to proclaim a state of emergency pursuant to Act No. 302 of the Public Acts of 1945, being sections 10.31 to 10.33 of the Michigan Compiled Laws[.]" We reject any contention that this provision only bars a limitation, modification, or abridgment of a governor's authority to *proclaim or declare* a state of emergency under the EPGA, absent any application to the *extension* of a state of emergency, thereby allowing imposition of the legislative-approval provision in § 3 of the EMA. We believe this to be a tortured construction of MCL 30.417(d) which clearly sought to preserve the entire EPGA and to preclude diminishing any and all of the powers the EPGA granted a governor in addition to his or her initial authority to declare an emergency. Moreover, the argument ignores the manner in which the EPGA operates under MCL 10.31. Pursuant to MCL 10.31(2), a governor proclaims or declares a state of emergency, and it simply continues until the governor declares "that the emergency no longer exists." There is no specific language in the EPGA regarding *extensions* of a state of emergency, so there would be no reason or need for such language in MCL 30.417(d).[10]

The Legislature makes the argument that the EMA is rendered meaningless if the Governor's position is validated and the Governor can take the very same measures under both the EMA and the EPGA. We, however, are simply not at liberty to question or ignore the Legislature's informed, intentional decision when enacting the EMA to leave the broad language of the EPGA untouched, fully intact, and operational. "It is a well-known principle that the Legislature is presumed to be aware of, and thus to have considered the effect on, all existing statutes when enacting new laws." *Walen v Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d 519 (1993). Here, we find compelling the fact that in enacting the EMA, the Legislature specifically referenced the EPGA. Hence, we know with certainty that the Legislature was aware of the EPGA; therefore, we must presume that the Legislature recognized and appreciated that the EPGA did not require legislative approval of a governor's actions in continuing a state of emergency until the emergency ceased. Despite this presumed knowledge, the Legislature, while requiring legislative approval to extend a state of emergency under the EMA, expressly declared that the EMA could not be construed as limiting, modifying, or abridging the EPGA.[11] Perhaps the Legislature desired an

---

[10] To be clear, however, there is nothing in the EPGA that prevents a governor from acting incrementally during an emergency.

[11] We do conclude that reading a requirement for legislative approval to extend a state of emergency into the EPGA would have the effect of limiting, modifying, or abridging a governor's

executive-legislative partnership in confronting a public emergency but also wished to avoid a political impasse and inaction in the face of an emergency should the partnership fail. Whatever the reason, we now simply read these statutes as required and accept the Legislature's explicitly articulated decision to retain the EPGA as a source of gubernatorial power during an emergency notwithstanding its subsequent enactment of the EMA.

## 4. DISCUSSION AND RESOLUTION – THE EPGA AND SEPARATION OF POWERS

The Legislature argues that if we construe the EPGA as urged by the Governor and determined by the Court of Claims, "then the statute faces a larger constitutional problem: separation of powers." The Legislature contends that the lawmaking power rests exclusively with the Legislature, that the Governor is unilaterally making laws, that the crisis does not diminish the separation of powers doctrine, and that the EPGA's supposed delegation of power to the Governor cannot save the EOs.

As an initial observation, we are at a loss to understand how the EPGA is apparently constitutional for purposes of separation of powers if construed to solely give a governor the power to address local emergencies but violates the separation of powers doctrine if applied to statewide emergencies. If there were an unconstitutional delegation of legislative power to the executive branch under the EPGA, whether that power is exercisable to only combat local emergencies or instead available to tackle local and statewide emergencies seems inconsequential to the constitutional analysis and determination of a violation. Regardless, the Legislature has failed to meet its burden to show that the EPGA violates the Separation of Powers Clause.

A statute is presumed to be constitutional, and courts are obligated to interpret a statute as constitutional unless its unconstitutionality is readily apparent. *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307; 806 NW2d 683 (2011). Extreme caution must be used when deciding whether to exercise the power to declare a statute unconstitutional. *Id.* If serious doubt exists with respect to whether we should declare a law unconstitutional, the power to do so must not be exercised. *Id.* at 307-308. Every reasonable presumption must be indulged in favor of the constitutional validity of a statute. *Id.* at 308. When examining an argument that a statute is unconstitutional, this Court does not make inquiry into the wisdom of the legislation. *Id.* The burden to prove that a statute is unconstitutional rests with the party who is challenging the law. *Id.*

As indicated earlier, legislative power is vested in the Legislature. Const 1963, art 4, § 1. Under Const 1963, art 4, § 51, "[t]he public health and general welfare of the people of the state are hereby declared to be matters of primary public concern" and "[t]he legislature shall pass suitable laws for the protection and promotion of the public health." Under our Separation of Powers Clause, Const 1963, art 3, § 2, and what is known as the nondelegation doctrine, which flows from the Clause, the legislative branch may not delegate its lawmaking authority to the executive or judicial branches. *Taylor v SmithKline Beecham Corp,* 468 Mich 1, 8; 658 NW2d

---

authority under the EPGA because the EPGA gives the governor alone the power to determine when an emergency has ended.

127 (2003); *Detroit v Detroit Police Officers Ass'n*, 408 Mich 410, 458; 294 NW2d 68 (1980); *Osius v St Clair Shores*, 344 Mich 693, 698; 75 NW2d 25 (1956).  In *Makowski v Governor*, 495 Mich 465, 482-483; 852 NW2d 61 (2014), our Supreme Court provided some clarification regarding the nondelegation doctrine, explaining:

> While the Constitution provides for three separate branches of government, Const 1963, art 3, § 2, the boundaries between these branches need not be "airtight[.]" In fact, in designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence. The true meaning [of the separation-of-powers doctrine] is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution.  [Quotation marks, citations, and alteration omitted; latter alteration in original.]

The Michigan Supreme Court has recognized that the Separation of Powers Clause and the nondelegation doctrine do not prevent our Legislature from obtaining the assistance of the coordinate branches.  *Taylor*, 468 Mich at 8-9.  In *Blue Cross & Blue Shield of Mich v Milliken*, 422 Mich 1, 51-52; 367 NW2d 1 (1985), the Supreme Court observed:

> Challenges of unconstitutional delegation of legislative power are generally framed in terms of the adequacy of the standards fashioned by the Legislature to channel the agency's or individual's exercise of the delegated power. Although for many years this and other courts evaluated delegation challenges in terms of whether a legislative (policymaking) or administrative (factfinding) function was the subject of the delegation, this analysis was replaced by the "standards" test as it became apparent that the essential purpose of the delegation doctrine was to protect the public from misuses of the delegated power. The Court reasoned that if sufficient standards and safeguards directed and checked the exercise of delegated power, the Legislature could safely avail itself of the resources and expertise of agencies and individuals to assist the formulation and execution of legislative policy.

> The criteria this Court has utilized in evaluating legislative standards are . . .: 1) the act must be read as a whole; 2) the act carries a presumption of constitutionality; and 3) the standards must be as reasonably precise as the subject matter requires or permits. The preciseness required of the standards will depend on the complexity of the subject. Additionally, due process requirements must be satisfied for the statute to pass constitutional muster. Using these guidelines, the Court evaluates the statute's safeguards to insure against excessive delegation and misuse of delegated power.  [Citations omitted.]

The "standards test" satisfies the Separation of Powers Clause, and when legislation contains, either expressly or by incorporation, adequate standards, then the courts, the public, and the Legislature may, if necessary, constitutionally "check" the use of delegated power. *Westervelt*

*v Natural Resources Comm'n,* 402 Mich 412, 439; 263 NW2d 564 (1978). "In making th[e] determination whether the statute contains sufficient limits or standards we must be mindful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power . . . ." *Dep't of Natural Resources v Seaman*, 396 Mich 299, 308-309; 240 NW2d 206 (1976).

We hold that the EPGA contains standards that are as reasonably precise as the subject matter—public emergencies—requires or permits, such that the Legislature, by enacting the EPGA, safely availed itself of the resources and expertise of the executive branch to assist in the execution of legislative policy. Accordingly, the EPGA does not violate the Separation of Powers Clause, and the Legislature did not prove otherwise. The standards found in the EPGA are sufficiently broad to permit the efficient administration of carrying out the policy of the Legislature with regard to addressing a public emergency but not so broad as to leave Michiganders unprotected from uncontrolled, arbitrary power.

The Legislature complains about the alleged broad and sweeping nature of the EOs issued by the Governor and criticizes the Governor for subjecting citizens to criminal penalties for violating those expansive EOs. But it was the Legislature itself, exercising its role to make policy and enact laws in 1945, that expressly declared that a governor is to exercise "broad" police power during a public emergency, MCL 10.32, and that explicitly directed that a violation of an order could "be punishable as a misdemeanor," MCL 10.33. Of course, the Legislature claims that the individuals composing the Legislature in 1945 overstepped their constitutional bounds when enacting the EPGA. We find it more than a bit disconcerting that the very governmental body that delegated authority to governors to confront public emergencies—and holds and has held the exclusive power to change it—steps forward 75 years later to now assert that it unconstitutionally delegated unconstrained authority.

Under the standards articulated by the Legislature in the EPGA, a governor may declare a state of emergency and promulgate orders, rules, and regulations to address a "great public crisis, disaster, rioting, catastrophe, or similar public emergency . . ., or [when there is] reasonable apprehension of immediate danger of a public emergency of that kind[.]" MCL 10.31(1). The declared emergency must imperil "public safety." *Id.* Considering the complexity of the subject matter and the myriad unfathomable forms that a public emergency could take, we find this language is as reasonably precise as the subject matter requires or permits. Indeed, more exacting standards would likely be overly confining and unnecessarily bind a governor's hands in any effort to mitigate and control an emergency at the very time he or she must need to be nimble.

Moreover, the orders, rules, and regulations must be "reasonable" and, as judged by a governor, "necessary to protect life and property or to bring the emergency situation . . . under control." *Id.* Reasonableness and necessity, as couched in the statutory language, constitute appropriate limits or standards that prohibit and can prevent the exercise of uncontrolled and

arbitrary power, yet are sufficiently broad to permit a governor to carry out the legislative policy of protecting life and property during an emergency and controlling a great public crisis.[12]

Adding further parameters or guidelines, the EPGA sets forth examples of appropriate orders, rules, and regulations, touching on traffic, transportation, the establishment of zones to regulate the use and occupancy of buildings, the prohibition and regulation of ingress and egress relative to buildings, the control of places of assembly and streets, curfews, and the transportation of explosives. *Id.* And a governor's authority ends when it is determined "that the emergency no longer exists." MCL 10.31(2). Finally, the EPGA "does not authorize the seizure, taking, or confiscation of lawfully possessed firearms, ammunition, or other weapons." MCL 10.31(3).[13]

In sum, exercising extreme caution, indulging every reasonable presumption in favor of the constitutionality of the EPGA, and evaluating the EPGA's safeguards, criteria, and standards in total, not in a vacuum, we conclude that there was no excessive or improper delegation of power to the governor with the enactment of the EPGA.

## C. THE EMA

If this panel, as urged by the Legislature, were to rule that the Governor violated the EMA and lacked authority to utilize the EMA to extend the state of emergency and issue EOs on and after April 30, 2020, it would be entirely pointless because the Governor had the authority to continue the very same state of emergency and issue the very same EOs under the EPGA. Stated otherwise, we could provide no meaningful relief to the Legislature if we ruled in its favor with respect to the EMA. Therefore, given our holding in regard to the EPGA, we can only conclude that any issues concerning the Governor's powers under the EMA are now moot. See *Anway v Grand Rapids R Co*, 211 Mich 592, 610; 179 NW 350 (1920) (a matter is moot if a judgment on the matter, "when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy"); *City of Jackson v Thompson-McCully Co, LLC*, 239 Mich App 482, 493;

---

[12] See *Mich State Hwy Comm v Vanderkloot*, 392 Mich 159, 173; 220 NW2d 416 (1974) (the standard of "necessity" in eminent domain statute is a sufficient standard for delegation of authority because it is as reasonably precise as the subject matter requires or permits); see also *Klammer v Dep't of Transp*, 141 Mich App 253, 262; 367 NW2d 78 (1985) ("In the context of this case, 'necessary' was a sufficiently precise standard."). "A *reasonable* determination is the antithesis of one which is *arbitrary*." *Dooley v Hwy Truckdrivers & Helpers, Local 107, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 192 F Supp 198, 200 (D Del, 1961) (emphasis added).

[13] As reflected in our discussion of the various standards and criteria in MCL 10.31, there is no basis whatsoever for the claim by the dissent-concurrence that we are holding that the EPGA empowers a governor "to do anything" the governor wishes. Furthermore, the "reasonable" standard in MCL 10.31(1) relative to promulgated orders interjects an objective component into the statute. See *Radtke v Everett*, 442 Mich 368, 387; 501 NW2d 155 (1993) (reasonableness involves an objective not subjective examination). Finally, the EPGA does not allow for the issuance of never-ending orders, as the governor's authority ceases at the conclusion of the emergency. MCL 10.31(2).

608 NW2d 531 (2000) ("An issue is moot if an event has occurred that renders it impossible for the court, if it should decide in favor of the party, to grant relief."); *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998) (applying doctrine of mootness where "there is no meaningful relief this Court can provide because petitioners can assign their lottery winnings to the same parties under the amended statute").

## D. INTERVENTION

Prospective intervenors argue that the Court of Claims abused its discretion by denying their motion to intervene. "This Court reviews a trial court's decision on a motion to intervene for abuse of discretion." *Auto-Owners Ins Co v Keizer-Morris, Inc,* 284 Mich App 610, 612; 773 NW2d 267 (2009). A court abuses its discretion when a decision falls outside the range of reasonable and principled outcomes. *Id.*

The five attorneys argue that their law practices "remain threatened by the possibility that the Governor will [impose] criminal prosecution for, well, going to our own offices 'too often.' " Prospective intervenors acknowledge that the stay-at-home EOs have been lifted, a fact that would appear to render moot the majority of their claims. Regardless, reversal is unwarranted. In denying the motion to intervene, the Court of Claims reasoned, in pertinent part:

> In this case, the putative intervenors echo much of the argument offered in support of the plaintiffs' case and additionally present . . . an "as applied" challenge to the scope of the executive orders as they affect lawyers and litigants. The focus of the case pled by plaintiffs is on an assertion that the Governor is without authority to act as she has under the Michigan Constitution, [the EMA], or [the EPGA]; or that the EPGA itself is unconstitutional. Those issues are adequately represented by the plaintiffs. The distinct issues of whether any, all, or some of the executive orders impermissibly infringe on the rights, duties or privileges of attorneys or their clients is not the focus of this case and would be better framed in a separate action. Additionally, this matter is emergent and affording party status to these putative plaintiffs would delay resolution.

The rule regarding permissive intervention,[14] MCR 2.209(B), provides as follows:

> On timely application a person may intervene in an action
>
> (1) when a Michigan statute or court rule confers a conditional right to intervene; or
>
> (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

---

[14] Prospective intervenors do not claim that they have a "right" to intervene under MCR 2.209(A).

In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

MCR 2.209(B)(2) was the only provision potentially implicated in this case. The five attorneys describe their arguments as "virtually identical" to those made by the Legislature. To the extent that this claim is true, our ruling today eliminates the need for future intervention by prospective intervenors to litigate the arguments already posed by the Legislature and rejected in this appeal. To the extent that the attorneys presented questions of law and fact unique to them, this does not bode well for them under MCR 2.209(B)(2), as it favors denial of intervention. Additionally, it would make no procedural sense to remand this case and allow the five cross-appellants to litigate those unique matters against the Governor; they can always file their own action or attempt to intervene in other lawsuits regarding the Governor's EOs. Moreover, on appeal, prospective intervenors do not even address the issue of any delay that would have been caused by their intervention, although the Court of Claims cited undue delay as a basis for its ruling. "When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015). In sum, we hold that there is no basis for reversal.

## V. CONCLUSION

Proceeding on the assumption that the Legislature had standing to file suit, we hold that the Governor's declaration of a state of emergency, her extensions of the state of emergency, and her issuance of related EOs clearly fell within the scope of the Governor's authority under the EPGA. We further hold that the EPGA does not violate the Separation of Powers Clause. We therefore decline to address whether the Governor was additionally authorized to take those same measures under the EMA and whether the Governor violated the EMA—those matters are moot. Finally, we hold that there is no basis to reverse the order of the Court of Claims denying the motion to intervene.

We affirm on the issues necessary to resolve this appeal.

/s/ Jane E. Markey
/s/ Kirsten Frank Kelly

-21-